# United States Court of Appeals
**FOR THE EIGHTH CIRCUIT**

_____

No. 08-4000

_____

United States of America,

                Appellee,

    v.

Sylvester Littlewind,

                Appellant.

Appeal from the United States
District Court for the
District of North Dakota.

[PUBLISHED]

_____

Submitted: October 21, 2009
Filed: February 26, 2010

_____

Before RILEY, HANSEN, and GRUENDER, Circuit Judges.

_____

HANSEN, Circuit Judge.

Sylvester Littlewind appeals a judgment entered on a jury verdict finding him guilty of assault with a dangerous weapon in violation of 18 U.S.C. §§ 113(a)(3) and 1153, assault resulting in serious bodily injury in violation of 18 U.S.C. §§ 113(a)(6) and 1153, and discharge of a firearm during a crime of violence in violation of 18 U.S.C. § 924(c)(1)(a) and (iii). Littlewind challenges: (1) the district court's[1] decision

_____

[1]The Honorable Ralph R. Erickson, now Chief Judge, United States District Court for the District of North Dakota.

to admit evidence of prior bad acts, and (2) the sufficiency of the evidence adduced at trial to convict him.  We affirm.

## I.

The evidence at trial, taken in the light most favorable to the verdict, showed the following facts.  During the two years preceding the incident precipitating this case, Sylvester Littlewind and Budene Eback shared a residence and carried on a romantic relationship.  The relationship was characterized by the prodigious consumption of alcohol, frequent verbal altercations, and repeated physical violence.  On one occasion, Littlewind even threatened to kill Eback.

After a characteristically intense argument on October 31, 2007, Eback gathered her personal belongings and vacated the residence.  A few days later, on November 3, Littlewind awoke at about 5 a.m. and began drinking alcohol.  At approximately 7:30 a.m., Eback called Littlewind and asked him to drive her and some friends to buy alcohol.  Littlewind picked up Eback and some other friends, and ultimately he drove them to a nearby town to purchase alcohol.  Littlewind purchased numerous 40 ounce bottles of high-alcohol-content beer and a pint of whiskey.  Littlewind drove the group around on back roads and stopped at other friends' houses.  Eback became so intoxicated that she could not later remember parts of the morning.

Eventually, three members of the group went to Littlewind's residence.  Eback remembers waking up on a mattress in the living room.  As she walked to the bathroom to wash her face, she observed Ruben Williams, one of that morning's drinking cohorts, with his head resting on the kitchen table and Littlewind seated across from him.  While in the bathroom, she did not see blood or bruising on her head or face.  When she returned from the bathroom, she observed a rifle leaning against a recliner in the living room.  She set the rifle on the floor and sat in the recliner.

Eback then went into the kitchen to get some ice water.  In the kitchen, Eback and Littlewind began to argue.

Because of the argument, Eback decided to leave.  She went for the front door, but Littlewind got there first and physically prevented her from leaving.  Eback managed to get the door open but, in the struggle, her foot got slammed in the door. Eback pulled her foot from the door, and the argument continued with Littlewind pushing her in the chest and away from the door.  Neither Eback nor Littlewind could recall what happened next.

That same morning, Littlewind's neighbor was outside repairing an automobile. The neighbor, Napoleon Longie, observed Littlewind pass by in his car numerous times; sometimes he was alone, and sometimes he was accompanied.  At some point that morning, Napoleon heard a popping noise that he thought to be a gunshot.  He was not concerned by the sound, however, because he lives near fields where people hunt and he hears gunshots regularly.

Sometime after the popping noise, Littlewind approached Napoleon and told him to call the police and an ambulance because someone had shot Eback.  According to Napoleon, Littlewind was "full of blood."  (Trial Tr. at 215.)

Henrietta Longie, who is Napoleon's mother and lives with Napoleon, also saw Littlewind driving numerous times that morning.  The final time Henrietta saw Littlewind driving, he was alone and driving away from his house.  That trip was fifteen to twenty minutes before Napoleon came into the house and told Henrietta that Eback had been shot.

Henrietta called emergency dispatch on her cell phone as she ran to Littlewind's residence.  She saw Eback near the back door, on the floor and covered with blood. Henrietta went to Eback to ascertain whether she was alive.  Eback reached for

Henrietta and told Henrietta to get her out of there. When Henrietta tried to get Eback up and out of the house, Littlewind grabbed Eback and put her in a chair in the kitchen. Littlewind then told Eback, "Babe, tell [Henrietta] I didn't do that. Tell her I didn't do that." (Trial Tr. at 357, 359). Henrietta noticed blood on the living room floor, next to the mattress. She also saw Littlewind in a blood-spattered gray sweater. At some point before the paramedics and police arrived, however, he changed into a blue shirt.

When paramedics arrived, Eback was sitting at the kitchen table with some type of cloth pressed to her head. Eback was bleeding from the back of her head and covered in blood. She told one of the paramedics that she was cleaning a gun at the kitchen table and it accidentally discharged.

Eback was transported via ambulance to a nearby emergency room. There, Eback told a physician's assistant that she was cleaning her gun and was shot in the back of the head. The emergency room did not have the resources to care for a gunshot wound to the head, so Eback was transported via helicopter to MeritCare Hospital in Fargo, North Dakota.

At MeritCare, Dr. David Stover headed the trauma team that treated Eback. Dr. Stover has extensive experience with trauma victims, including gunshot victims. Dr. Stover observed two wounds to Eback's head; one smaller than the other. In Dr. Stover's experience, gunshot injuries often consist of an entrance wound and a relatively larger exit wound. To Dr. Stover, Eback's injury was consistent with a gunshot injury. Dr. Jeffery Lystad was also part of the trauma team that treated Eback. He believed the wounds were consistent with a gunshot injury, but could not identify—due to blood-matted hair—which wound was the entrance wound and which was the exit wound.

-4-

Despite a blood alcohol content over 0.4 percent—fives time the legal limit to drive—and the loss of approximately half her blood volume, Eback survived.

Littlewind gave numerous explanations for Eback's injury. When he first reported the injury to Napoleon, he said someone had shot Eback. Then, while waiting for the police and ambulance, Littlewind told Napoleon someone had hit Eback in the head. When law enforcement Special Agent Donovan Wind responded to the injury scene, Littlewind told Special Agent Wind that Littlewind returned home and found Eback had been shot. After being arrested for public intoxication and while in jail, Littlewind told a correctional officer that he thought Eback's injury was somehow related to his son's drug dealing. He told the same correctional officer that he woke up and Eback was standing by his bed with that injury. The day after Eback was injured, Littlewind was interviewed by Special Agent Wind and an FBI agent. He first told the agents that he awoke after feeling his arm was warm, to find Eback covered in blood. He also told them he returned home, saw an unidentified person running from his house, and found Eback was injured. Later that day, Littlewind made a written statement that he had no memory of the relevant time period. When the agents told Littlewind they did not believe him, he admitted he had a .22 caliber rifle in his house. He then made a second written statement. The second statement avers that Littlewind and Eback were arguing over the gun when it accidentally discharged, injuring Eback. The same statement indicates he discarded the gun in a nearby wetland.

The agents told Littlewind he could write Eback a letter and they would deliver it. Littlewind wrote:

> Budene, I want to tell [you] I love you and to see if you are all right. When you get out of the hospital take care of my house. Things are a little foggy right now. I didn't mean to hurt you but you know drinking makes people do weird things. I'll understand if you don't love me anymore. I probably won't be able to see you for a while. I will always

keep you in my heart. Try to get ahold of me or give that FBI guy a letter so he can give it to me. I love you always. Son Littlewind.

(Trial Tr. at 757).

Later, Littlewind guided law enforcement to the wetland he mentioned in his statement in search of the gun. Even after employing a search and rescue team, the authorities did not find a gun.

Littlewind was charged by indictment. Prior to trial, the district court held an evidentiary hearing regarding the admissibility of certain prior bad acts by Littlewind. The district court allowed evidence of three prior bad acts: (1) a February 13, 2006, tribal court assault and battery conviction; (2) a September 22, 2006, tribal court conviction for domestic abuse and public intoxication; and (3) a July 10, 2007, tribal court conviction for public intoxication. Each of the three prior bad acts involved violence by Littlewind against Eback.

The judge submitted three counts to the jury. The jury convicted Littlewind of all three counts, including assault with a dangerous weapon in violation of 18 U.S.C. §§ 113(a)(3) and 1153, assault resulting in serious bodily injury in violation of 18 U.S.C. §§ 113(a)(6) and 1153, and discharge of a firearm during a crime of violence in violation of 18 U.S.C. § 924(c)(1)(a) and (iii).

Littlewind appeals. He argues that the prior bad acts were inadmissible and that there was insufficient evidence to support the guilty verdict on each count.

## II.

Littlewind argues that the district court erred by admitting evidence of the three prior convictions, in violation of Federal Rule of Evidence 404(b). While Littlewind

concedes the evidence is relevant to the question of whether he intended to assault Eback, he contends that the probative value of the convictions was substantially outweighed by a danger of unfair prejudice.

Federal Rule of Evidence 404(b) outlaws admission of evidence of other crimes, wrongs, or acts proffered "to prove the character of a person in order to show action in conformity therewith." The rule does, however, allow evidence of other crimes, wrongs, or acts "for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Fed. R. of Evid. 404(b). The rule is one of inclusion, "such that evidence offered for permissible purposes is presumed admissible absent a contrary determination." United States v. Johnson, 439 F.3d 947, 952 (8th Cir. 2006). Subject to the district court's broad discretion to admit evidence of other crimes, we will reverse a district court's decision to admit evidence under Federal Rule of Evidence 404(b) "'only when such evidence clearly had no bearing on the case and was introduced solely to prove the defendant's propensity to commit criminal acts.'" United States v. Thomas, 398 F.3d 1058, 1062 (8th Cir. 2005) (quoting United States v. Howard, 235 F.3d 366, 372 (8th Cir. 2000)). Evidence of other crimes is admissible under Rule 404(b) if it is "(1) relevant to a material issue; (2) similar in kind and close in time to the crime charged; (3) proven by a preponderance of the evidence; and (4) if the potential prejudice does not substantially outweigh its probative value." Id.

Littlewind argues only that potential unfair prejudice substantially outweighed the probative value of the evidence. We must respectfully disagree. Evidence of past crimes can be probative of a defendant's intent to commit a similar act. See United States v. Turner, 583 F.3d 1062, 1066 (8th Cir. 2009); United States v. Escarsega, 182 Fed. Appx. 595, 598 (8th Cir. 2006) (unpublished per curiam) ("The evidence of [the defendant's] other assaults was relevant to show that he intended to cause bodily harm during the charged offense."). Additionally, the relative probative value of prior crime evidence is "increased by the fact that both offenses were associated with the same

victim." See United States v. Walker, 428 F.3d 1165, 1170 (8th Cir. 2005), cert. denied, 546 U.S. 1194 (2006). In this case, the past acts and the presently charged crimes involved intoxication and physical abuse of the same victim, making them quite similar and relatively more probative. At trial, Littlewind introduced evidence suggesting Eback's injury may have resulted from a drunken fall—likely to show a lack of criminal intent or the presence of an accident. Thus, the prior crimes evidence contradicted Littlewind's defense. And while the risk of unfair prejudice was more than marginal, the risk was adequately reduced by two cautionary instructions from the district court—one when the prior crimes evidence was first admitted and another within the final jury instructions. Such limiting instructions minimize the danger of unfair prejudice. United States v. Hessman, 493 F.3d 977, 983 (8th Cir. 2007), cert. denied, 128 S. Ct. 1100 (2008). Considering the probative value of the evidence, along with the effect of the limiting instructions, we cannot say the prior crimes evidence "'clearly had no bearing on the case and was introduced solely to prove the defendant's propensity to commit criminal acts.'" See Thomas, 398 F.3d at 1062 (quoting Howard, 235 F.3d at 372). Consequently, the district court did not abuse its discretion in admitting the challenged convictions.

III.

Littlewind also contends the evidence was insufficient to convict him of any of the three counts submitted to the jury. We will reverse a jury's verdict "'only if no reasonable jury could have found the defendant guilty beyond a reasonable doubt.'" United States v. Timlick, 481 F.3d 1080, 1082 (8th Cir. 2007) (quoting United States v. May, 476 F.3d 638, 641 (8th Cir. 2007)). "[R]easonable inferences from the evidence are sufficient to support the guilty verdict." United States v. Warbonnet, 750 F.2d 698, 700 (8th Cir. 1984) (per curiam). In reviewing the sufficiency of the evidence, "we must not weigh the evidence or assess the credibility of witnesses." United States v. Raplinger, 555 F.3d 687, 693 (8th Cir.), cert. denied, 129 S. Ct. 2814

(2009). Instead, we must presume that the trier of fact resolved any conflicts in favor of the Government. United States v. Water, 413 F.3d 812, 816 (8th Cir. 2005). If the evidence adduced at trial rationally supports conflicting hypotheses, we refuse to disturb the conviction. United States v. Jimenez-Serrato, 336 F.3d 713, 715 (8th Cir. 2003). We review the record with that circumscribed standard of review in mind.

As a general matter, Littlewind's arguments about the evidence can be distilled into two primary complaints. He argues there is insufficient evidence to prove Eback's injury was caused by a gunshot, and he also argues that, even if Eback did suffer a gunshot wound, Littlewind did not cause the wound, or at least he did not intentionally cause the wound. Littlewind repeatedly suggests there is no evidence to support an adverse jury verdict. While there is no surfeit of direct evidence in this case, both direct and circumstantial evidence can lend support to a jury's verdict. See United States v. Lam, 338 F.3d 868, 871 (8th Cir. 2003) (noting this court treats circumstantial evidence no differently than direct evidence when reviewing the sufficiency of the evidence to support a jury verdict).

First, there is more than adequate evidence in the record to support a jury finding that Eback suffered a gunshot wound. Eback testified she saw a rifle in Littlewind's living room within the minutes preceding her injury. A short while later, Littlewind told a neighbor that Eback had been shot. The same neighbor heard a popping sound, like a gunshot, the morning of Eback's injury. Eback told a paramedic, and later a physician's assistant, she was shot while cleaning a gun. During the subsequent investigation, Littlewind told law enforcement, in a written statement, that he and Eback struggled over the gun and it accidentally discharged. Additionally, there was medical testimony supporting a finding that Eback's wound was consistent with a gunshot wound. Dr. Stover observed what he believed to be an entrance wound and an exit wound, consistent with a gunshot. Here again, Littlewind attempts to discredit the jury's conclusion that a gunshot caused the injury by pointing to conflicting evidence concerning the cause of Eback's injury. The jury was entitled

to credit Dr. Stover's testimony and to discredit arguably contradictory testimony. See United States v. Velazquez, 410 F.3d 1011, 1016 (8th Cir.) (noting province of jury to weigh testimony and credit witnesses), cert. denied, 546 U.S. 971 (2005).

Littlewind's second argument—that he did not cause the wound, or at least not intentionally—similarly fails. The jury heard testimony that Littlewind and Eback shared a tumultuous relationship. In the two years they lived together, police repeatedly were called to investigate alcohol-related bouts of domestic violence. Each time, Eback was injured and accused Littlewind of abusing her. One of the abusive episodes resulted in a puncture to Eback's ear drum. Another time, Littlewind threatened to kill Eback. Just days before the alleged assault in this case, the couple's troubles flared up again, leading Eback to move out of Littlewind's house.

Eback testified that on the day of the assault, she awoke on a mattress in Littlewind's living room after a morning of hard drinking. After going to the bathroom to wash her face—and failing to notice an injury to her head or neck while in the bathroom—she returned to the living room where she observed a rifle leaning against a recliner. See United States v. Center, 750 F.2d 724, 726 (8th Cir. 1984) (recounting fact that defendant possessed knife shortly before stabbing as relevant to conviction for violating 18 U.S.C. §§ 113(c) and 1153). A short time later, she was engaged in an argument with Littlewind. See United States v. Knife, 592 F.2d 472, 479 (8th Cir. 1979) (finding the requisite intent to support assault conviction where, among other factors, the defendant was upset preceding a gun assault, "tempers were short and emotions high"). When she attempted to leave via the front door, Littlewind blocked her path, slammed the door on her foot, and began pushing her backwards into the interior of the house.

In one of Littlewind's versions of that day's events, he admitted the two struggled over the gun and it discharged. Although Littlewind suggests the admission was concocted by law enforcement and elicited through trickery, the jury was entitled

to credit his admission. See Velazquez, 410 F.3d at 1016. Littlewind also admitted to disposing of the gun in a nearby wetland. See United States v. Kuehne, 547 F.3d 667, 691-92 (6th Cir. 2008) (holding "attempt to tamper with evidence is probative of guilt"), cert. denied, 130 S. Ct. 342 (2009). Henrietta Longie's testimony—that she saw Littlewind driving away alone from his house fifteen to twenty minutes before he reported Eback's injury—provides circumstantial support for his admission that he disposed of the gun.

Littlewind told Napoleon Longie to call the police and an ambulance because Eback had been shot. Napoleon and his mother, Henrietta, both observed blood on Littlewind's gray sweatshirt. Before paramedics or police arrived, Littlewind changed out of the gray blood-marked sweatshirt. See id. When Napoleon and Henrietta went to Eback's aid at Littlewind's house, Eback implored Henrietta to get her out of the house. Later, while Eback was in the hospital, Littlewind sent her an apology letter. See Center, 750 F.2d at 726 (noting apology as evidence of assault).

"'Since you cannot look into the mind of a person, intent must necessarily be inferred either from his acts or statements.'" United States v. Hollow, 747 F.2d 481, 483 (8th Cir. 1984) (quoting Coil v. United States, 343 F.2d 573, 577 (8th Cir.), cert. denied, 382 U.S. 821 (1965)). The evidence indicates that Littlewind was angry to the point of physically preventing Eback from leaving the house and that he had ready access to a gun. Creditable evidence indicates the two struggled over the gun, it discharged, and Eback was wounded. Littlewind's anger gave way to thoughts of disposing of the gun that caused the injury. Later, his worry turned to remorse, and he apolgized to Eback. From all these facts—a historically abusive relationship; anger, argument, and preceding physical altercation; an admission to a struggle over a gun; Eback's desire to get away from Littlewind after her injury; and Littlewind's guilty mind—the jury could have reasonably inferred that Littlewind intended to assault Eback with the gun. In other words, a reasonable jury could have rationally

hypothesized that Littlewind intended to assault Eback with the gun, a struggle ensued, the gun discharged, and Eback was seriously injured.

Under this scenario, each element of each of the three offenses is supported by substantial evidence. The elements necessary for a conviction on Count I, a violation of 18 U.S.C. §§ 113(a)(6) and 1153, were: "(1) an intentional assault that (2) results in serious bodily injury, committed (3) by an Indian and (4) within Indian Country." United States v. Stymiest, 581 F.3d 759, 766 (8th Cir. 2009). Littlewind only challenged the sufficiency of the evidence to support the existence of the first element. As explained above, a rational interpretation of the evidence allows a finding that he had the requisite intent.

Count IV, alleging a violation of 18 U.S.C. §§ 113(a)(3) and 1153, required proof: (1) of an assault, (2) with the use of a dangerous weapon, (3) with the intent to do bodily harm, (4) by an Indian, and (5) within Indian Country. See United States v. Phelps, 168 F.3d 1048, 1056 (8th Cir. 1999) (first three elements); Center, 750 F.2d at 725-26 (exercising jurisdiction where Indian committed assault on Indian land and explaining relationship between §§ 113 and 1153). Here again, a rational interpretation of the evidence existed to allow the jury to conclude that an intentional assault using a dangerous weapon occurred.

Finally, the violation of § 924(c)(1)(A) required proof that Littlewind used or carried a firearm during or in relation to a crime of violence. The sentencing enhancement found in § 924(c)(1)(A)(iii) additionally required proof of the discharge of a firearm during a crime of violence; it does not require proof of an intentional discharge. Dean v. United States, 129 S.Ct. 1849, 1853 (2009).[2] The jury was

---

[2]Littlewind acknowledges "§ 924(c)(1)(A)(iii) does not require a showing of specific intent to discharge a firearm." (Appellant's Reply Br. at 6.) He does not argue the indictment and instructions in this case—requiring a knowing

instructed that the crime charged in either Count I or IV would provide the crime of violence, if the jury found either count committed. Littlewind did not question the propriety of the elements of the district court's § 924(c) instruction. Again, sufficient evidence supported a finding that a firearm was discharged during the commission of those crimes; how else could a gunshot wound have been inflicted?

Littlewind's challenge to the sufficiency of the evidence must be rejected "because the jury's verdict must be upheld if *any* rational interpretation of the evidence, regardless of countervailing evidence, would allow a reasonable-minded jury to conclude guilt beyond a reasonable doubt." See Jimenez-Serrato, 336 F.3d at 715. Such a rational interpretation exists.

IV.

Accordingly, the judgment of the district court is affirmed.

_____

_____

discharge—became the "law of the case." Absent such an argument, the issue of whether the intent element became the law of the case is not squarely presented by the parties, and we refuse to address the issue in this novel context. See United States v. Inman, 558 F.3d 742, 749-50 (8th Cir.) (evaluating sufficiency of the evidence to support a guilty verdict where indictment correctly stated law but jury instructions differed from elements of indictment and statute, viewing as dicta our prior pronouncements that sufficiency of the evidence to support a jury verdict is measured according to "law of the case" as established by indictment and jury instructions, and ultimately measuring the sufficiency of the evidence "according to the applicable law"), cert. denied, 130 S. Ct. 304 (2009).