# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 10-3668

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | District of Minnesota. |
| Edward Joseph Lowen, | * | |
| | * | |
| Appellant. | * | |

_____

Submitted: June 15, 2011
Filed: July 29, 2011

_____

Before LOKEN, BEAM, and GRUENDER, Circuit Judges.

_____

GRUENDER, Circuit Judge.

A jury found Edward Lowen guilty of one count of bank robbery, a violation of 18 U.S.C. § 2113(a). Lowen appeals, and for the reasons that follow, we affirm.

## I.    BACKGROUND

On February 26, 2010, a man wearing aviator-style sunglasses, a baseball cap, white tennis shoes, work-style gloves, and a camouflage jacket entered the First National Bank of Walker in Akeley, Minnesota, and approached teller Janet Sheets. The bank's surveillance camera footage showed the man hand a duffel bag to Sheets

while pointing a gun at her. Sheets testified that the man demanded money and said "I'm not kidding." Sheets placed approximately $2,525 into the duffel bag from her cash drawer and watched the man exit the bank and drive away in a dark blue Chevrolet Tahoe. Lori Robbins and Joyce Farrington, two other employees on duty that day, provided similar accounts of the robber, describing him as wearing a black baseball cap, aviator-style sunglasses, a camouflage jacket, and white tennis shoes.

Seeking tips as to the robber's identity, law enforcement released a still image of the robber from the bank's surveillance camera footage to the media. Tammy Jo Eischens, a woman married to Lowen's ex-wife's cousin, viewed the surveillance image in the Park Rapids Enterprise newspaper and informed law enforcement, and later testified at trial, that she recognized the man in the image to be Lowen. Eischens had known Lowen for fifteen years and saw him in person three to four times per year, including two weeks prior to the robbery. Law enforcement officers investigating the robbery also discovered that Lowen was the registered owner of a dark blue Chevrolet Tahoe.

Based on these tips, five law enforcement officers, including Investigator Colter Diekmann and Special Agent Chad Museus, traveled to Lowen's residence in Park Rapids, Minnesota. Upon arriving, the officers noticed a dark blue Chevrolet Tahoe parked in Lowen's driveway. Investigator Diekmann and Special Agent Museus approached the residence and knocked on the door, but there was no answer. Soon after, Investigator Diekmann and Special Agent Museus approached a man walking near the road leading to Lowen's residence, identified themselves as law enforcement investigating a bank robbery, and inquired as to the man's identity. The man confirmed that he was Lowen. Investigator Diekmann asked Lowen if he would speak with law enforcement, to which Lowen responded that he would. After Lowen allowed the officers into his home, Investigator Diekmann and Special Agent Museus questioned Lowen around his dinner table. Lowen denied owning a camouflage jacket or white tennis shoes and admitted that he was unemployed and having financial

difficulties. Officers asked Lowen if they could search the Chevrolet Tahoe and his residence, and Lowen agreed to both. Upon searching the vehicle, officers discovered a dark-colored baseball cap, a pair of work-style gloves, and a pair of aviator-style sunglasses. Upon searching the wooded area near Lowen's home, they also recovered a pair of white tennis shoes.

Based on this evidence, two of the officers left the premises to obtain a search warrant while another officer read Lowen his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966). Thereafter, Lowen requested the assistance of counsel. Officers executed the search warrant and, from inside of Lowen's home, seized a photograph of Lowen wearing camouflage clothing, a black fleece duffel bag similar in appearance to the duffel bag used by the robber to carry the stolen money from the bank, a money order dated March 1, 2010, in the amount of $1,100, and an instruction manual for an air pistol similar in appearance to the weapon used by the robber.

During the investigation that followed, law enforcement officers discovered that, on February 28, Lowen used $1,500 in cash to purchase chips at the Northern Lights Casino in Walker, Minnesota. A casino manager testified that Lowen played blackjack for approximately ten hours on February 28 and March 1. Officers also determined that Lowen had purchased an air pistol on February 15—eleven days before the robbery—at a Wal-Mart store in Park Rapids, Minnesota. The instruction manual recovered at Lowen's home matched the model Lowen had purchased.

Lowen moved to suppress his statements made during his questioning prior to receiving the *Miranda* warnings, including his denial that he owned camouflage clothing or white tennis shoes and his admission that he "could use some money." A magistrate judge[1] concluded that Lowen was not in custody at the time of the

---

[1] The Honorable Raymond L. Erickson, Chief Magistrate Judge, United States District Court for the District of Minnesota.

questioning and recommended denying the motion. The district court[2] adopted the magistrate judge's report and recommendation and denied Lowen's motion, and Lowen proceeded to trial. At trial, Lowen stipulated that he owed the State of Minnesota $7,713.20. At the conclusion of the Government's case, Lowen moved for a judgment of acquittal pursuant to Fed. R. Crim. P. 29, and the district court denied the motion. Lowen renewed his motion for judgment of acquittal after the jury was charged, and the district court again denied the motion. The jury found Lowen guilty of one count of bank robbery. The district court sentenced Lowen to 71 months' imprisonment. Lowen appeals his conviction, challenging the denial of his motion to suppress, the sufficiency of the evidence, and the admission of Sergeant Cory Aukes's identification testimony.

## II. DISCUSSION

### A. Motion to Suppress

Lowen first argues that the district court should have suppressed the statements he made to Investigator Diekmann and Special Agent Museus because he was in custody and was not advised of his *Miranda* rights. "*Miranda* requires that law enforcement agents provide certain prescribed warnings before conducting an interrogation of a suspect who is in custody." *United States v. New*, 491 F.3d 369, 373 (8th Cir. 2007). "The Supreme Court in *Miranda* stated that warnings are required when interrogation is 'initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.'" *Id.* (quoting *Miranda*, 384 U.S. at 444). "When reviewing the denial of a motion to suppress, we review the district court's factual findings for clear error . . . ." *United States v. Muhlenbruch*, 634 F.3d 987, 995 (8th Cir. 2011). "We

_____

[2] The Honorable Richard H. Kyle, United States District Judge for the District of Minnesota.

review de novo the district court's legal conclusion that [the defendant] was not 'in custody' at the time of his interview." *Id.*

The question "whether a suspect is 'in custody' is an objective inquiry." *J.D.B. v. North Carolina*, 564 U.S. ---, 131 S. Ct. 2394, 2402 (2011). "Two discrete inquiries are essential to the determination: first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was at liberty to terminate the interrogation and leave," *id.* (quoting *Thompson v. Keohane*, 516 U.S. 99, 112 (1995)), "or in this case, to terminate the interrogation and cause the [officers] to leave," *New*, 491 F.3d at 373. "Once the scene is set and the players' lines and actions are reconstructed, the court must apply an objective test to resolve the ultimate inquiry: was there a formal arrest or restraint on freedom of movement of the degree associated with formal arrest." *J.D.B.*, 131 S. Ct. at 2402 (quoting *Thompson*, 516 U.S. at 112); *see also United States v. LeBrun*, 363 F.3d 715, 720 (8th Cir. 2004) (en banc).

"Rather than demarcate a limited set of relevant circumstances, we have required police officers and courts to 'examine all of the circumstances surrounding the interrogation.'" *J.D.B.*, 131 S. Ct. at 2402 (quoting *Stansbury v. California*, 511 U.S. 318, 322 (1994)). In the instant case, both the parties and the district court relied heavily on the six non-exclusive factors expounded by our court in *United States v. Griffin*, 922 F.2d 1343 (8th Cir. 1990), for evaluating whether an individual is in custody for purposes of *Miranda*.[3] "There is no requirement . . . that the *Griffin*

---

[3] These factors are:

(1) [W]hether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond

analysis be followed ritualistically in every *Miranda* case." *United States v. Czichray*, 378 F.3d 822, 827 (8th Cir. 2004). "When the factors are invoked, it is important to recall that they are not by any means exclusive, and that 'custody' cannot be resolved merely by counting up the number of factors on each side of the balance and rendering a decision accordingly." *Id.* at 827. "The ultimate inquiry must always be whether the defendant was restrained as though he were under formal arrest." *Id.* at 828; *see also LeBrun*, 363 F.3d at 720.

Lowen asserts that the district court clearly erred when it made certain factual findings regarding the interrogation. Lowen concedes that he was "not physically restrained" but argues that he was "physically controlled" because Investigator Diekmann and Special Agent Museus determined where Lowen would be questioned and "asked him to strike certain poses for photographs." We disagree. It is undisputed that Diekmann and Museus asked Lowen if he would speak with them and, later, if they could enter Lowen's home in order to continue their questioning and that Lowen consented to both of these requests. Although Diekmann and Museus questioned Lowen around his dinner table, Lowen was not confined to any portion of his home during the questioning. Also, the record reveals that Lowen voluntarily agreed to be photographed. Lowen contends that the district court clearly erred when it determined that officers did not use deceptive techniques because Diekmann and Museus never informed Lowen that he was their only suspect. This determination was not clearly erroneous. The record reveals that Diekmann and Museus informed Lowen that they were investigating the robbery of the First National Bank and that his

---

to questions; (4) whether strong arm tactics or deceptive stratagems were employed during questioning; (5) whether the atmosphere of the questioning was police dominated; or, (6) whether the suspect was placed under arrest at the termination of the questioning.

*Griffin*, 922 F.2d at 1349. The first three factors tend to mitigate the existence of custody, while the last three tend to aggravate it. *See United States v. Boslau*, 632 F.3d 422, 427 (8th Cir. 2011).

vehicle and physical description matched that of the robber. As such, the district court did not clearly err when determining the factual setting of the interrogation.

Given these circumstances, we conclude that a reasonable person in Lowen's position would have felt at liberty to terminate the interrogation and cause the officers to leave. Lowen voluntarily acquiesced to Investigator Diekmann's and Special Agent Museus's requests to respond to questioning. Only two of the five officers present questioned Lowen, and the questioning occurred in Lowen's home. "When a suspect is interrogated in the comfort and familiarity of his home, a court is less likely to find the circumstances custodial." *United States v. Axsom*, 289 F.3d 496, 502 (8th Cir. 2002). Moreover, Lowen's freedom of movement was not restrained by handcuffs or any other means. The officers also did not confine Lowen during the questioning and did not arrest him upon the completion of the questioning. Diekmann and Museus' failure to inform Lowen that he was not under arrest is not dispositive, *see United States v. Flores-Sandoval*, 474 F.3d 1142, 1147 (8th Cir. 2007), as the touchstone of our inquiry remains whether Lowen was restrained as though he were under formal arrest, *see LeBrun*, 363 F.3d at 720.

In light of the totality of the circumstances surrounding Lowen's questioning, we agree with the district court that Lowen's freedom of movement was not restrained to the degree associated with a formal arrest. *See J.D.B.*, 131 S. Ct. at 2402. Thus, he was not in custody at the time he made the relevant statements. *See United States v. Lawson*, 563 F.3d 750, 753 (8th Cir. 2009) (determining that the defendant was not in custody because he "was not restrained, he was interviewed in his own home, . . . he was not physically threatened, and he was interviewed for less than one hour"). Accordingly, the district court did not err when it denied Lowen's motion to suppress.

**B.** **Motion for Judgment of Acquittal**

Lowen also asserts that the district court erred when it denied his motion for judgment of acquittal pursuant to Fed. R. Crim. P. 29, arguing that the Government presented insufficient evidence on which the jury could find him guilty. "We review the denial of a motion for acquittal *de novo*." *United States v. Donnell*, 596 F.3d 913, 924 (8th Cir. 2010) (quoting *United States v. Thropay*, 394 F.3d 1004, 1005 (8th Cir. 2005)), *cert. denied*, 562 U.S. ---, 131 S. Ct. 994 (2011). "Where a party challenges the evidence underlying his conviction, the standard of review is very strict, and the jury's verdict is not to be lightly overturned." *United States v. Finch*, 630 F.3d 1057, 1060 (8th Cir. 2011) (quoting *United States v. Hayes*, 391 F.3d 958, 961 (8th Cir. 2004)). "In reviewing the sufficiency of the evidence on appeal, the court views the evidence in the light most favorable to the government, resolving evidentiary conflicts in favor of the government, and accepting all reasonable inferences drawn from the evidence that support the jury's verdict." *Id.* (quoting *United States v. Bates*, 77 F.3d 1101, 1104-05 (8th Cir. 1996)). "[W]e will reverse only if no reasonable jury could have found the defendant guilty beyond a reasonable doubt." *United States v. Brewer*, 624 F.3d 900, 906 (8th Cir. 2010) (quoting *United States v. McCraney*, 612 F.3d 1057, 1063 (8th Cir. 2010)), *cert. denied*, 563 U.S. ---, 131 S. Ct. 1805 (2011).

Lowen's central contention is that the Government failed to present sufficient evidence that he was, in fact, the bank robber because none of the bank tellers was able to positively identify him as the robber, law enforcement did not find the weapon used by the robber or any cash in Lowen's home, and a number of the articles found in Lowen's home and vehicle did not match exactly the items worn by the robber. We disagree. Eischens, who had known Lowen for fifteen years and saw Lowen two weeks prior to the robbery, testified that Lowen was the man in the surveillance image. While Lowen contends that Eischens was not credible because she is an employee of the Hubbard County Sheriff's office and is related through marriage to Lowen's ex-wife, we have made it clear that a jury's credibility determinations are

"virtually unassailable on appeal," *Brewer*, 624 F.3d at 906 (quoting *United States v. Nguyen*, 608 F.3d 368, 376 (8th Cir. 2010)), and "we must presume that the trier of fact resolved any conflicts in favor of the Government," *id.* at 906-07 (quoting *United States v. Littlewind*, 595 F.3d 876, 882 (8th Cir. 2010)).

The Government presented additional identity evidence that could lead a reasonable jury to conclude that Lowen was the robber. Lowen's white tennis shoes, aviator-style sunglasses, work-style gloves, and dark-colored baseball cap all match the attire of the robber described by witnesses. Lowen argues that he "raised substantial questions" regarding whether the clothing worn by the robber matched the clothing recovered from Lowen's residence and vehicle, but we must assume that the jury resolved these conflicts in favor of the Government. *See id.* The Government presented to the jury a photograph of Lowen wearing camouflage clothing and a black fleece duffel bag recovered from Lowen's residence similar in appearance to the duffel bag used by the robber. Moreover, Lowen did not answer truthfully when Diekmann and Museus asked him if he owned camouflage clothing or white tennis shoes. *See United States v. Van*, 543 F.3d 963, 965 (8th Cir. 2008) ("Van's lie to the police about how long he was in Barthol's apartment . . . w[as] additional evidence supporting the jury's verdict . . . ."). Additionally, the Government presented evidence that Lowen purchased an air pistol similar in appearance to the weapon used in the robbery just eleven days before the robbery occurred and that Lowen spent a total of $2,600 in cash—just $75 more than what the robber stole from the First National Bank—within days of the robbery despite owing more than $7,700 to the state of Minnesota. Finally, the Government showed that Lowen owned a dark blue Chevrolet Tahoe like the vehicle described by witnesses as the one used by the robber to flee the bank. We conclude that the evidence was sufficient for a reasonable jury to conclude that Lowen was guilty of robbing the First National Bank. Consequently, the district court properly denied Lowen's motion for judgment of acquittal.

## C.    Admission of Sergeant Aukes's Testimony

Lowen also argues that the district court abused its discretion by improperly applying Fed R. Evid. 701[4] when it allowed Sergeant Cory Aukes—a witness called by Lowen—to testify, on cross-examination by the Government, that he believed Lowen "absolutely looks like the person on the videotape."  Sergeant Aukes's only previous encounter with Lowen was a brief one, while Lowen was in custody awaiting trial.  Lowen suggests that the district court abused its broad discretion because Sergeant Aukes had no greater familiarity with Lowen than the jury and had no dealings with the defendant prior to his arrest.  *See United States v. Cruz*, 285 F.3d 692, 700 n.4 (8th Cir. 2002) ("An identification witness's testimony must be rationally based on the perception of the witness, and is admissible if there is some basis for concluding that the witness is more likely to correctly identify the defendant from the photograph than is the jury." (internal citations and quotation marks omitted)).

Assuming, without deciding, that it was error to admit Aukes's testimony, we conclude that the error was harmless.  "An error is harmless if we conclude that no substantial rights of the defendant were affected and that the error did not influence or had only a very slight influence on the verdict."  *United States v. Tenerelli*, 614 F.3d 764, 771 (8th Cir. 2010) (quoting *United States v. Eagle*, 498 F.3d 885, 888 (8th Cir. 2007)), *cert. denied*, 562 U.S. ---, 131 S. Ct. 1589 (2011).  "An error in admitting testimony may be harmless if the testimony is corroborated by independent sources, or if it amounts to cumulative evidence on matters already before the jury."  *United States v. Melecio-Rodriguez*, 231 F.3d 1091, 1094 (8th Cir. 2000) (per curiam).  In this case, as we have discussed, the Government presented ample identification

---

[4] "Rule 701 permits a lay witness to provide 'opinions or inferences which are (a) rationally based on the perception of the witness, and (b) helpful to a clear understanding of the witness's testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.'"  *United States v. Ali*, 616 F.3d 745, 754 (8th Cir. 2010) (quoting Fed. R. Evid. 701).

evidence from independent sources, including the testimony of Eischens, who knew Lowen for fifteen years and saw Lowen two weeks before the robbery, as well as the items of clothing discovered at Lowen's residence that matched the clothing worn by the robber. Thus, we conclude that Sergeant Aukes's additional identification was cumulative and had no more than a slight influence on the verdict. Accordingly, any error in admitting Aukes's testimony was harmless.

## III.  CONCLUSION

For the foregoing reasons, we affirm Lowen's conviction.

_____