# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 05-2503

_____

|  |  |  |
|---|---|---|
| United States of America, | * | |
| | * | |
| | * | |
| Appellee, | * | Appeal from the United States |
| | * | District Court for the |
| v. | * | Southern District of Iowa. |
| | * | |
| Johnny Lee Ollie, Jr., | * | |
| | * | |
| Appellant. | * | |

_____

Submitted: November 15, 2005
Filed: March 31, 2006

_____

Before ARNOLD, BEAM, and RILEY, Circuit Judges.

_____

ARNOLD, Circuit Judge.

Johnny Lee Ollie appeals the district court's denial of his motion to suppress statements that he made to the police. We reverse.

## I.

Adel, Iowa, police chief James McNeill responded to a call asking for certain property to be removed from an apartment. When he arrived, Nicola Teed escorted him to a bedroom and directed him to a dresser behind which he discovered a loaded .22 revolver and a holster. Ms. Teed said that neither she nor her boyfriend,

Mr. Ollie, owned the gun. During that conversation, she also told Chief McNeill that Mr. Ollie was on parole.

Upon returning to his office, Chief McNeill telephoned Roy Klobnak, Mr. Ollie's parole officer. In their conversation, Chief McNeill stated that he wanted to talk with Mr. Ollie concerning the handgun. Mr. Klobnak had a regularly scheduled meeting with Mr. Ollie the following day and told Chief McNeill that he would order Mr. Ollie to meet the chief at the police station.

The next day, following his parole meeting, Mr. Ollie arrived at the police station, and Chief McNeill escorted him to an interview room. Chief McNeill did not give *Miranda* warnings to Mr. Ollie before beginning an interview. In response to Chief McNeill's questioning, Mr. Ollie twice said that he did not own or possess a gun, but when the chief asked if Mr. Ollie would continue to deny ownership if the police found fingerprints on the weapon that matched Mr. Ollie's, Mr. Ollie admitted that he had handled the gun. Chief McNeill then asked Mr. Ollie if he would be willing to give a written statement. He agreed, and Chief McNeill gave him *Miranda* warnings. Mr. Ollie then completed a brief written statement, which indicated that he had received the gun in exchange for driving two people to a liquor store.

Before trial, Mr. Ollie moved to suppress statements that he made during his interview with Chief McNeill and his subsequent written statement, arguing that Chief McNeill's failure to give him *Miranda* warnings at the outset of the interview made all of his statements inadmissible. The district court denied the motion, holding that Mr. Ollie was not in custody when he confessed and therefore Chief McNeill had no obligation to give Mr. Ollie those warnings. After a brief trial, Mr. Ollie was convicted of being a felon in possession of a firearm and a felon in possession of ammunition. He was sentenced to ten years in prison.

II.

When a suspect is interrogated in a custodial setting, the police must advise him of his right not to answer questions and to have an attorney present during questioning. *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). The clearest example of custody is when a suspect is placed under formal arrest. Absent a formal arrest, the police must give *Miranda* warnings when the suspect's freedom of movement is restricted to a degree akin to a formal arrest. *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (per curiam); *United States v. LeBrun*, 363 F.3d 715, 720 (8th Cir. 2004) (en banc), *cert. denied*, 125 S. Ct. 1292 (2005). Whether Mr. Ollie was in custody is not a matter of his own subjective belief, but turns on whether a reasonable person in his shoes would have felt free to end the interview. *See Berkemer v. McCarty*, 468 U.S. 420, 442 (1984). In deciding whether a person is in custody, we consider all the circumstances confronting the person when he or she was questioned. We review the district court's factual findings for clear error and its legal conclusions, including the ultimate question of custody, *de novo*. *LeBrun*, 363 F.3d at 719.

We have identified several matters that are relevant to a determination of whether an interview is custodial. *See United States v. Axsom*, 289 F.3d 496, 500 (8th Cir. 2002); *United States v. Griffin*, 922 F.2d 1343, 1349 (8th Cir. 1990). Some considerations generally act to mitigate the custodial atmosphere: These are, for instance, whether the police told the suspect that he or she was free to leave, was free to refuse to answer questions, or was not under arrest; whether the person's movements were unrestrained during the interview; and whether the person either initiated contact with authorities or voluntarily acquiesced to official requests. Other considerations tend to aggravate the interview's custodial nature: They are, among other things, whether the police used coercive or deceptive tactics that restricted the suspect's freedom to terminate the encounter and whether the questioning occurred in a police-dominated atmosphere. *See Axsom*, 289 F.3d at 500; *see also LeBrun*, 363 F.3d at 721. No single consideration is dispositive, nor must they all weigh in the

defendant's favor for us to decide that he or she was in custody. *Axsom*, 289 F.3d at 501.

Both sides agree that Chief McNeill told Mr. Ollie twice that he was not under arrest. At the same time, he did not mention that Mr. Ollie could terminate the interview or refuse to answer questions. While advising someone that he or she is not under arrest helps to mitigate an interview's custodial nature, an explicit assertion that the person may end the encounter is stronger medicine. Such a statement provides an individual with a clear understanding of his or her rights and generally removes any custodial trappings from the questioning. *See United States v. Czichray*, 378 F.3d 822, 826 (8th Cir. 2004), *cert. denied*, 125 S. Ct. 2514 (2005). Chief McNeill's statements to Mr. Ollie, while falling short of an ideal, do weigh against a determination that he was in custody.

A suspect will generally feel more able to end an interview when his mobility is unimpeded by the authorities. We thus look to see if Mr. Ollie was free to move about during the interview. When Mr. Ollie arrived at the police station, Chief McNeill took him to a small interview room. In that room, the Chief sat alone with Mr. Ollie and left the door ajar. In its order, the district court found no evidence that the police restrained Mr. Ollie's freedom of movement. Such a negative finding, however, is qualitatively different from stating that Mr. Ollie was free to move about. The record is silent on this issue because Mr. Ollie never tried to move about or leave the interview room. Because the record is thin, we believe that it is impossible to determine if Mr. Ollie retained his freedom of movement throughout the questioning.

We do conclude, however, that Mr. Ollie neither initiated contact with the Adel police nor voluntarily acquiesced to questioning. Chief McNeill told Mr. Ollie's parole officer that he wished to speak with Mr. Ollie concerning the gun found at the apartment. At their meeting the following day, the parole officer ordered Mr. Ollie to go talk with Chief McNeill. Despite this, the district court concluded that

-4-

Mr. Ollie went to meet Chief McNeill of his own free will. We think that this finding is clearly erroneous. The parole officer testified that it would have been a violation of his parole for Mr. Ollie to refuse to go to the meeting and that a refusal could have led to Mr. Ollie's parole being revoked, and Mr. Ollie testified that because of this order he felt that he had no choice but to meet with Chief McNeill. Faced with such pressures, we think that Mr. Ollie had little choice but to comply. Unlike the suspect in *Axsom*, 289 F.3d at 498, 502, who (after an officer expressed interest in talking with him "if he would like to speak with her") was "extremely friendly and cooperative" and pointed out incriminating evidence to law enforcement, Mr. Ollie's conduct revealed little more than an absence of resistance. While a defendant does not need to be enthusiastic about an interview for us to conclude that he voluntarily acquiesced, we think it clear here that Mr. Ollie was responding to pressure.

Although Chief McNeill used some deceptive tactics during his interview with Mr. Ollie, we do not believe that the type of deception that he used is relevant to the present inquiry. When the chief asked Mr. Ollie whether his story would change if his fingerprints had been found on the gun, his question contained an implicit factual assertion that the police had matched Mr. Ollie's fingerprints to the weapon. In fact, his fingerprints had not been matched, and the chief acknowledged that his deceptive question was intended to elicit a confession from Mr. Ollie. In *LeBrun*, 363 F.3d at 721, however, we stated "that the coercive aspects of a police interview are largely irrelevant to the custody determination except where a reasonable person would perceive the coercion as restricting his or her freedom to depart," and the Supreme Court has held that an officer's false statement to a defendant that his fingerprints were found at the scene of the crime had "nothing to do with whether [the defendant] was in custody for purposes of the *Miranda* rule," *Oregon v. Mathiason*, 429 U.S. 492, 495-96 (1977) (per curiam). Here the chief falsely implied that Mr. Ollie's fingerprints were on the gun. Since this kind of deceit would not have acted to prevent a reasonable person from terminating the interview, it cannot affect our custody determination.

But we do find that the interview took place in a police-dominated atmosphere and that this atmosphere would have restrained a reasonable person's movements. In contrast to *Axsom*, where the suspect was interviewed at home, in this case the police questioned Mr. Ollie at the police station. It is true that an interview is not custodial simply because it occurs at the station house. *Mathiason*, 429 U.S. at 495. But if the fact that questioning taking place on a suspect's "home turf" cuts against a finding of custody, *see United States v. Rorex*, 737 F.2d 753, 756 (8th Cir. 1984), then the converse must also be true: Interviews taking place on the police officers' "home turf" are more likely to be police-dominated. Here, Mr. Ollie's parole officer ordered him to meet with Chief McNeill. Once he arrived, Mr. Ollie was led to a small conference room where he sat alone with the police chief, a man considerably larger than himself. And, as we have already said, Mr. Ollie testified that he felt obligated to follow his parole officer's order to meet with Chief McNeill.

The district court, in denying the motion to suppress, held that any fear that Mr. Ollie had that his parole would be in jeopardy if he failed to cooperate was unreasonable. The district court cited *United States v. Cranley*, 350 F.3d 617, 622 (7th Cir. 2003), for the proposition that a statement is not compelled merely because a suspect has a subjective fear of such punishment. The Supreme Court has said that such fears are unreasonable because it has repeatedly held "that the State could not constitutionally carry out a threat to revoke probation for the legitimate exercise of the Fifth Amendment privilege." *Minnesota v. Murphy*, 465 U.S. 420, 438 (1984). A statement is compelled only when the authorities expressly or implicitly threaten to punish the suspect unless he or she speaks. *Id.* at 435-38.

But the matter at issue here is whether Mr. Ollie was in custody and therefore entitled to the *Miranda* warnings, not whether his statements were compelled. The ultimate question therefore is not whether a reasonable person would fear that he could be punished unless he spoke, but whether he could be punished for ending the interview without the permission of the police or his parole officer. If such a fear is

a reasonable one, the existence of such a fear on the part of the parolee would contribute to a finding of custody.

The fear that Mr. Ollie faced was different from the fear facing the defendant in *Murphy*. As the Court in *Murphy* stated, the defendant's fear would not have been reasonable because the Court had repeatedly held that a parolee could not be punished for exercising his or her fifth amendment rights and refusing to answer questions. *Murphy*, 465 U.S. at 438. The underlying principle of both *Murphy* and *Cranley* is that a fear is unreasonable when it flies in the face of settled law; because such a clear rule has been established, no reasonable person could think that he or she could be punished. Thus, if there were substantial precedents holding that a parolee could not be punished for ending a interview without the consent of the police or his or her parole officer, then the principle underlying *Murphy* would cause us to conclude that Mr. Ollie's fear was unreasonable. But no such clear rule has been established; indeed, we know of no decisions by the Court that would forestall such punishment. We therefore conclude that a reasonable person in Mr. Ollie's position could think that any attempt to terminate the interview could result in a revocation of his parole. Given the circumstances, it seems to us that a reasonable person would believe that the police had control over the interview.

It is important to note that a decision on the matter of custody requires more than tallying a ledger. Where one criterion is particularly influential, the failure to find other indicia of custody is not necessarily fatal. In the end, these criteria are only useful tools meant to focus attention. The ultimate decision requires a hard look at all of the circumstances. That assessment leads us to believe that Mr. Ollie was in custody at the time that he made his inculpatory statements to Chief McNeill. Above all else, we think that it is the parole officer's order that Mr. Ollie meet with Chief McNeill that quite clearly tips the balance. Faced with such an order, we think that a reasonable person in Mr. Ollie's position would have been extremely reluctant either to refuse the interview or to terminate it once it began. In the words of the parole

officer, had Mr. Ollie refused to attend the interview "it would have been a violation of his parole and [a revocation of his parole status] very well could have happened." Had Mr. Ollie attempted to leave the interview, he could have reasonably expected the same reaction. We therefore disagree with the district court and hold that the failure to advise Mr. Ollie of his rights pursuant to *Miranda* requires the suppression of his initial oral confession to Chief McNeill.

## III.

Following Mr. Ollie's initial confession, Chief McNeill gave the defendant *Miranda* warnings, and Mr. Ollie then wrote out a brief statement detailing how he came to possess the gun. Mr. Ollie moved to suppress this second statement in the district court, arguing that Chief McNeill's belated *Miranda* warnings were a deliberate tactic employed to maximize the chances of eliciting a confession. The district court did not decide if the chief's conduct was a deliberate attempt to avoid *Miranda* because it held that *Miranda* did not apply since Mr. Ollie was never in custody.

Since we have held that Mr. Ollie was in custody, we must decide whether the chief's tardy administration of the *Miranda* warnings requires suppression of Mr. Ollie's post-warning statement. In *Oregon v. Elstad*, 470 U.S. 298, 300 (1985), police went to the defendant's home to arrest him on a burglary charge. After they entered the house and arrested the defendant, but before they gave him *Miranda* warnings, he incriminated himself in response to police questioning. Approximately one hour later at the police station, the arresting officers provided the defendant with *Miranda* warnings. Indicating that he understood his rights and wished to speak to the officers, the defendant once again confessed. After being convicted of robbery, the defendant argued that the confession that he gave at the police station should have been suppressed. *Id.* at 300-03.

The Supreme Court held in *Elstad*, 470 U.S. at 318, that "a suspect who has once responded to unwarned yet uncoercive questioning is not thereby disabled from waiving his rights and confessing after he has been given the requisite *Miranda* warnings." The "subsequent administration of *Miranda* warnings," said the Court, "ordinarily should suffice to remove the conditions that precluded admission of the earlier statement." *Id.* at 314. The Court rejected the argument that the fruit-of-the-poisonous-tree doctrine required suppression of the subsequent statement. *Id.* at 308. The later statement was admissible so long as it was made voluntarily, and its voluntariness was not undercut by the suspect's ignorance that his initial statement could not be used against him. *Id.* at 316-17.

In response to *Elstad*, some police officers began to conduct "question-first" interrogations, where officers would intentionally refrain from giving the *Miranda* warnings to suspects in custody. Once the police elicited a confession (which they knew to be inadmissible), they would then give the warnings. The suspect would generally confess again. If those confessions were then challenged, courts relying on *Elstad* would often uphold their admissibility. *See Missouri v. Seibert*, 542 U.S. 600, 609-611 (2004).

In *Seibert*, the Supreme Court reconsidered the permissibility of a two-step interrogation technique. The Court was sharply divided. A plurality of four justices questioned whether the *Miranda* warnings, when given immediately following a confession, could effectively advise a suspect of his or her rights. If they could not, then providing the *Miranda* warnings meant effectively nothing, and there was no reason to admit the later statement while simultaneously suppressing the first. *See id.* at 612-14 (plurality opinion). To determine whether the midstream warnings could be effective in advising the suspect of his or her rights, the plurality suggested that courts consider five criteria: "the completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of the two statements, the timing and setting of the first and the second, the continuity of police

personnel, and the degree to which the interrogator's questions treated the second round as continuous with the first." *Id.* at 615. Applying these criteria to the police interrogation in *Seibert*, the plurality concluded that the *Miranda* warnings had not sufficiently apprised the defendant of her rights. *Id.* at 616-17.

We believe that faced with the present record, the *Seibert* plurality would conclude that Mr. Ollie's written statement should be suppressed. In the first round of questioning, Chief McNeill repeatedly asked Mr. Ollie if he owned or possessed the weapon. That questioning ceased only when Mr. Ollie orally confessed to having handled the gun. Chief McNeill then immediately asked Mr. Ollie to reaffirm and memorialize his confession in writing. It was only once Mr. Ollie agreed to that request that the police gave the *Miranda* warnings. And although Mr. Ollie gave more detail in his written confession, both statements concerned the same subject matter. As was the case with the defendant in *Siebert*, we believe that Mr. Ollie would have had to see the two sessions "as parts of a continuum, in which it would have been unnatural to refuse to repeat at the second stage what had been said before." *Id.* at 616-17.

Justice Kennedy concurred in the judgment in *Seibert*, thereby providing the Court with its fifth vote. Unlike the plurality, Justice Kennedy would not have courts inquire as to whether midstream *Miranda* warnings were effective every time a suspect in custody gave an unwarned confession, was given the warnings, and then confessed again. Such situations would continue to be governed by *Elstad*. Justice Kennedy would suppress post-warning statements only where the police intentionally used the two-step interrogation technique to render the *Miranda* warnings ineffective. Such statements would be inadmissible unless the police took curative measures that would ensure that a reasonable person would understand his or her rights. *Id.* at 621-22 (Kennedy, J., concurring in the judgment).

Although our court has sometimes invoked the *Seibert* plurality's criteria in determining the effectiveness of midstream *Miranda* warnings, *see, e.g., United States v. Fellers*, 397 F.3d 1090, 1098 (8th Cir. 2004), *cert. denied*, 126 S. Ct. 415 (2005), it is Justice Kennedy's concurrence that is "of special significance," *United States v. Briones*, 390 F.3d 610, 613 (8th Cir. 2004), *cert. denied*, 125 S. Ct. 2925 (2005); *see United States v. Black Bear*, 422 F.3d 658, 664 (8th Cir. 2005). Because Justice Kennedy provided the fifth vote and his concurrence resolved the case on narrower grounds than did the plurality, it is his reasoning that rules the present case. *See Marks v. United States,* 430 U.S. 188, 193 (1977); *Black Bear*, 422 F.3d at 664. Other circuits have similarly found Justice Kennedy's concurrence controlling. *See United States v. Naranjo*, 426 F.3d 221, 231-32 (3d Cir. 2005); *United States v. Mashburn*, 406 F.3d 303, 308-09 (4th Cir. 2005); *United States v. Stewart*, 388 F.3d 1079, 1090 (7th Cir. 2004). *But see United States v. Rodriguez-Preciado*, 399 F.3d 1118, 1139-42 (9th Cir. 2005) (Berzon, J., dissenting).

Although Justice Kennedy's rationale dictates the outcome of this case, his opinion leaves several questions unresolved. One major issue is which party bears the burden of proof as to deliberateness and what that burden should be. While Justice Kennedy's focus on intent allows courts to avoid conducting a prolix inquiry every time a two-step interrogation occurs, determining the officer's state of mind at the time of the interrogation can be difficult. Generally, the Court has avoided such subjective approaches, in part because evidence of intent is rarely available. In *Seibert,* the interrogating officer specifically testified that he intended to withhold the *Miranda* warnings. It is unlikely that such direct evidence will be available in most cases.

No circuit appears to have decided which party bears the burden of proof on the matter of deliberateness. As one commentator put it, in the absence of such guidance, courts have tended to "eyeball" the issue. Daniel S. Nooter, Note, *Is* Missouri v. Seibert *Practicable?: Supreme Court Dances the "Two-Step" Around*

Miranda, 42 Am. Crim. L. Rev. 1093, 1113 (2005). In *United States v. Hernandez-Hernandez*, 384 F.3d 562, 566 (8th Cir. 2005), we said that it "*does not appear* that the trooper, Border Patrol, and INS used a multi-step interrogation in a 'calculated way to undermine the *Miranda* warning.' " (emphasis added) (quoting *Seibert*, 542 U.S. at 622 (Kennedy, J., concurring in the judgment)). Similarly, a recent decision of the Third Circuit found that an officer's failure to provide *Miranda* warnings "*seems much more likely* to have been a simple failure to administer the warnings rather than an intentional withholding that was part of a larger, nefarious plot." *Reinert v. Larkins*, 379 F.3d 76, 91 (3d Cir. 2004) (emphasis added), *cert. denied*, 126 S. Ct. 173 (2005).

We hold that when a defendant moves to suppress a post-warning statement that he contends was given as part of a question-first interrogation, the prosecution must prove, by a preponderance of the evidence, that the officer's failure to provide warnings at the outset of questioning was not part of a deliberate attempt to circumvent *Miranda*. Placing that burden on the prosecution is consistent with prior Supreme Court decisions that require the government to prove the admissibility of a confession before it may come into evidence. In *Brown v. Illinois*, 422 U.S. 590, 603-04 (1975), for instance, the Supreme Court put the burden on the government to prove that a suspect's confession was not the fruit of an earlier illegal arrest. And when the government sought to introduce a confession obtained after the police provided the *Miranda* warnings, the Court put the burden on the prosecution to prove, by a preponderance of the evidence, that the suspect waived those rights. *Colorado v. Connelly*, 479 U.S. 157, 168 (1986).

In addition, putting the burden of proof on the prosecution will help ensure that probative evidence is brought to the court's attention. We understand that the law generally frowns on requiring a party to prove a negative. But where one side typically possesses all or most of the pertinent evidence, it is appropriate to burden it with proving the relevant matter.

-12-

Here, the government has failed to meet that burden because it produced no evidence on the question at all. The police could have taken curative measures to help Mr. Ollie understand the true import of the belated *Miranda* warnings, but it did not. *Seibert* therefore requires the exclusion of the written confession.

## IV.

For the foregoing reasons, we reverse.

———————————————