# United States Court of Appeals
## For the Eighth Circuit

_____

No. 20-3451

_____

United States of America

*Plaintiff - Appellee*

v.

Aldo Daniel Gastelum

*Defendant - Appellant*

_____

Appeal from United States District Court
for the Western District of Arkansas - Texarkana

_____

Submitted: June 17, 2021
Filed: September 1, 2021

_____

Before LOKEN, KELLY, and ERICKSON, Circuit Judges.

_____

ERICKSON, Circuit Judge.

After stopping Aldo Daniel Gastelum's rental car for a traffic violation, Arkansas State Trooper Bernard Pettit conducted a warrantless search of the vehicle's trunk and found over 15 kilograms of a mixture or substance containing cocaine. Gastelum moved to suppress the evidence from the search, claiming Trooper Pettit

impermissibly extended the traffic stop and Gastelum did not voluntarily consent to the search of his trunk. The district court[1] denied Gastelum's motion. We affirm.

## I.    BACKGROUND

In the early evening hours of April 7, 2018, Trooper Pettit stopped Gastelum, who was driving on a busy interstate in Arkansas, for an unsafe lane change. Trooper Pettit approached the passenger-side window of the vehicle, informed Gastelum of the reason for the stop, told him to be more careful when changing lanes, and asked for his license and insurance information. Gastelum indicated the vehicle was rented and handed over the rental information.

Trooper Pettit asked Gastelum about his travel plans. The encounter was captured on video and was conversational and friendly. When Trooper Pettit inquired about where Gastelum was going, Gastelum said he had rented the vehicle in Houston and was on his way to Chicago. Gastelum reported that he was a veteran of both the Marine Corps and the Army and that he was visiting Army Reserve facilities to try to secure a position in the Army Reserve. Gastelum said he had left the service in 2012, and when Trooper Pettit asked him what he had been doing since, Gastelum explained he was now a college student in California and had broke his leg in a hit-and-run accident. Trooper Pettit inquired how Gastelum got to Houston, and Gastelum rather randomly discussed reserve units in Houston. Gastelum eventually explained that he was planning to fly back to California from Chicago. When Trooper Pettit asked about joining a reserve unit in California, Gastelum said he was interested in medical units in Houston and San Antonio.

---

[1]The Honorable Susan O. Hickey, Chief Judge, United States District Court for the Western District of Arkansas.

Trooper Pettit returned to his patrol vehicle and confirmed Gastelum's license and identification information. Trooper Pettit also reviewed the rental agreement and noticed that it was a one-way single-day rental agreement for $734.39. Trooper Pettit found the details regarding Gasetlum's trip, such as its length, cost, and reason, peculiar.

Gastelum had been stopped for approximately 15 minutes when Trooper Pettit printed a warning for the unsafe lane change and walked back to Gastelum's vehicle. After commenting on the weather, Trooper Pettit stated, "Okay, we're about done here." The tone of the conversation remained friendly as Trooper Pettit asked Gastelum whether he had any luggage in the trunk. When Gastelum responded that he did, Trooper Pettit replied, "Quick check of that and then we'll be done. Alright, come on out for me and pop that trunk on your way out." Gastelum fumbled for the trunk release, apparently unfamiliar with the rental car. Trooper Pettit turned his body towards the back of the vehicle, whistled, and then joked that trunk releases "are kind of hard to find." Before Gastelum opened the trunk, but while he was looking for the trunk release, Trooper Pettit asked Gastelum, "You don't mind if I look back there, do you? You don't care, huh? That's fine?" Trooper Pettit testified that he was repeating what Gastelum was saying. Shortly thereafter, Gastelum opened the trunk and exited the vehicle.

Trooper Pettit opened a duffle bag in the trunk and saw a large quantity of cocaine. He ordered Gastelum to the ground and handcuffed him. Over 15 kilograms of cocaine were eventually recovered from the trunk.

Gastelum was indicted for possessing with intent to distribute five kilograms or more of a mixture or substance containing cocaine. See 21 U.S.C. § 841(a)(1) and (b)(1)(A)(ii)(II). He moved to suppress the cocaine, arguing that Trooper Pettit violated the Fourth Amendment both when he extended the traffic stop and when he searched the trunk. An evidentiary hearing was held, and the court denied the motion.

Gastelum conditionally pled guilty to the cocaine charge. He was sentenced to 30 months' imprisonment and 3 years' supervised release. Gastelum appeals the denial of his suppression motion.

## II. DISCUSSION

"In reviewing a denial of a motion to suppress, we review the district court's findings of fact for clear error, giving due weight to the inferences police drew from those facts. We review de novo the district court's legal conclusion that reasonable suspicion or probable cause existed." United States v. Pacheco, 996 F.3d 508, 511 (8th Cir. 2021) (citations omitted).

Gastelum does not dispute that Trooper Pettit's initial decision to conduct a traffic stop was lawful. He instead argues that Trooper Pettit (1) unreasonably prolonged the stop, and (2) unlawfully searched the trunk without voluntary consent.

### A. Extension of the Traffic Stop

Gastelum does not challenge any portion of the traffic stop occurring prior to Trooper Pettit issuing a warning ticket. Instead, he contends Trooper Pettit lacked reasonable suspicion to extend the stop once Trooper Pettit returned to his vehicle with a warning ticket. We disagree.

Under the Fourth Amendment, an officer may not extend a stop beyond "the time needed to handle the matter for which the stop was made" unless he develops a reasonable, articulable suspicion of criminal activity. Rodriguez v. United States, 575 U.S. 348, 350 (2015). "An officer's suspicion of criminal activity may reasonably grow over the course of a traffic stop as the circumstances unfold and more suspicious facts are uncovered." United States v. Magallon, 984 F.3d 1263, 1278 (8th Cir. 2021) (citations omitted). Reasonable suspicion requires "a particularized

-4-

and objective basis for suspecting legal wrongdoing based upon [the officer's] own experience and specialized training." Pacheco, 996 F.3d at 511 (citations omitted). While a "mere hunch" is insufficient, "the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." United States v. Arvizu, 534 U.S. 266, 274 (2002) (cleaned up). The reasonable suspicion analysis is based on the totality of the circumstances meaning individual elements of suspicion are not to be viewed in isolation. United States v. Sanchez, 955 F.3d 669, 675 (8th Cir. 2020).

Considering the totality of the circumstances in this case, Trooper Pettit had reasonable suspicion to extend the stop. Trooper Pettit, a law enforcement officer with over 25 years of experience, has attended numerous drug-interdiction trainings each year since 2008 and has participated in as many as 100 traffic stops resulting in criminal seizures. Numerous facts alerted this experienced officer that criminal activity was afoot.

First, Trooper Pettit recognized that the rental was for too short of a time to accomplish Gastelum's stated goal of visiting reserve centers to inquire about positions in medical units. With a one-day rental and a 12–15 hour drive from Houston to Chicago, there was very little time to visit reserve units. In addition, Trooper Pettit stopped Gastelum about six hours from Houston. Gastelum rented the car in Houston about six hours before the stop, rendering it unlikely that Gastelum was telling the truth about visiting medical units in Houston and San Antonio.

Trooper Pettit also discerned that the cost of the car rental far exceeded the cost of flying. Based on his training and experience, Trooper Pettit was aware that drug smugglers often transport narcotics in rental vehicles (rather than planes) regardless of the cost. We have previously found the existence of reasonable suspicion based on both "the incongruity between [a defendant's] short rental period and his described travel plans" and "the 'outwardly puzzling decision to rent a car for a one-way trip

-5-

at substantial expense.'" Pacheco, 996 F.3d at 512 (quoting United States v. McCarty, 612 F.3d 1020, 1025 (8th Cir. 2010)); see also United States v. Murillo-Salgado, 854 F.3d 407, 416 (8th Cir. 2017) (rental period).

Second, Gastelum's explanation for the purpose of his trip did not make sense. Trooper Pettit could not discern why a disabled college student would spend the time and expense to travel from California to Houston and then Chicago to visit reserve units, rather than just visit reserve units in California. And, although Trooper Pettit admitted he had never worked as a military recruiter, he served in the Air Force Reserves and knew that individuals do not just drive up to reserve units seeking a billet. We have found that "odd answers" and strange travel plans can support a finding of reasonable suspicion. Pacheco, 996 F.3d at 512; see also Sanchez, 955 F.3d at 675 (finding reasonable suspicion based, in part, on the strangeness of an out-of-state vehicle traveling at night with babies purportedly to do a paint job).

Third, Trooper Pettit's suspicion was heightened by the emphasis Gastelum repeatedly placed on his military background during their conversation. For example, when Trooper Pettit tried to determine how Gastelum arrived in Houston, Gastelum evaded the question by further discussing his military background and aspirations. Gastelum also had materials with military insignia in his passenger seat, which Trooper Pettit suspected were displayed as a "prop to deflect [his] attention." While the display of military insignia, alone, is not a basis for reasonable suspicion, Gastelum's deflection of Trooper Pettit's questioning with a non-responsive discussion about his military experience is a permissible consideration, just as any other evasive answer would be. See United States v. Williams, 929 F.3d 539, 545 (8th Cir. 2019).

We find no clear error in the district court's findings or its conclusion that Trooper Pettit had reasonable suspicion. Although Gastelum contends none of the individual facts noted above are, by themselves, incriminating or support reasonable

suspicion, the Supreme Court has repeatedly recognized that even facts consistent with "innocent travel" can, when taken together, amount to reasonable suspicion. United States v. Sokolow, 490 U.S. 1, 9 (1989); see also Arvizu, 534 U.S. at 277–78. Here, Gastelum's evasive answers and dubious travel plans, combined with the inconsistencies between his travel plans and the rental agreement, were sufficient for Trooper Pettit to suspect criminal activity was afoot and extend the traffic stop.[2]

## B.     Voluntary Consent

Gastelum next argues that the evidence from the traffic stop must be suppressed as the product of an illegal search of his trunk because the district court clearly erred in finding he voluntarily consented to the search rather than acquiesced to Trooper Pettit's command. See United States v. Steinmetz, 900 F.3d 595, 598 (8th Cir. 2018) ("Whether a person voluntarily consented to a search is a factual determination that we review for clear error."). We disagree.

A warrantless search is valid under the Fourth Amendment if it is "conducted pursuant to the knowing and voluntary consent of the person subject to a search." United States v. Sanders, 424 F.3d 768, 773 (8th Cir. 2005) (citations omitted). The government bears the burden to demonstrate that Gastelum knowingly and voluntarily consented to the search. See Magallon, 984 F.3d at 1280. That "issue turns not on the defendant's subjective state of mind, but on whether the officer reasonably believed the defendant consented." Id. (citations omitted). That is, the question is

---

[2]Gastelum's reliance on United States v. Beck, 140 F.3d 1129 (8th Cir. 1998), is unavailing as we have repeatedly distinguished that case "so much so that Beck may be essentially limited to its facts at this point." Pacheco, 996 F.3d at 513 n.3 (collecting cases). Because, for example, the driver in Beck did not describe travel plans which plainly contradicted his rental agreement, we find Beck distinguishable here as well.

"whether it was reasonable for the officer to believe that the suspect gave him permission to search the requested item." Id.

As with most Fourth Amendment analyses, we consider the totality of the circumstances to evaluate whether consent was voluntary, including

> (1) the individual's age and mental ability; (2) whether the individual was intoxicated or under the influence of drugs; (3) whether the individual was informed of [his] *Miranda* rights; and (4) whether the individual was aware, through prior experience, of the protections that the legal system provides for suspected criminals. It is also important to consider the environment in which an individual's consent is obtained, including (1) the length of the detention; (2) whether the police used threats, physical intimidation, or punishment to extract consent; (3) whether the police made promises or misrepresentations; (4) whether the individual was in custody or under arrest when consent was given; (5) whether the consent was given in public or in a secluded location; and (6) whether the individual stood by silently or objected to the search.

United States v. Carr, 895 F.3d 1083, 1089 (8th Cir. 2018) (citations omitted). While the dissent suggests that these factors are irrelevant because they do not inform whether consent was given, Gastelum consented when he affirmatively responded to Trooper Pettit's three follow-up questions and, therefore, the dispositive issue is whether the consent was voluntary.

Gastelum contends Trooper Pettit issued him an unlawful command to open his trunk when he requested to check the luggage in the trunk and then said: "come on out" "and pop that trunk on your way out." The district court found that, even if Trooper Pettit's initial statement was impermissible, Trooper Pettit "quickly retracted that directive and instead asked for permission, which [Gastelum] was free to refuse." Considering the totality of the circumstances, this finding is not clearly erroneous.

-8-

An important consideration when assessing the voluntariness of consent is the environment in which Gastelum consented. Carr, 895 F.3d at 1089. The video shows a friendly and relaxed environment and a cordial discussion between Trooper Pettit and Gastelum for the entirety of the stop. The encounter was demonstrably free of "threats, physical intimidation, [and] punishment." Id. (citations omitted). The video shows that Trooper Pettit was understated, unauthoritative, and polite.

While we agree that Trooper Pettit's initial comment about the trunk is problematic, we do not view that comment in isolation. Both while he made his initial statement about popping the trunk and after, the conversation's tone remained relaxed. After Trooper Pettit said to pop the trunk, he turned away and whistled for a moment, and then joked about how hard trunk releases are to find. Then, before Gastelum opened the trunk, Trooper Pettit expressly sought Gastelum's consent by asking three times whether he could search the trunk—"You don't mind if I look back there, do you? You don't care, huh? That's fine?" Gastelum gave affirmative responses to each question.

Gastelum is an intelligent adult with a college education and military experience. While the dissent argues that these factors weigh against voluntariness, we have held that an educated, experienced adult is more likely to be informed and exercise his right to refuse a search. See, e.g., United States v. Barnum, 564 F.3d 964, 970–71 (8th Cir. 2009); United States v. Comstock, 531 F.3d 667, 677 (8th Cir. 2008); United States v. Lee, 356 F.3d 831, 834–35 (8th Cir. 2003). Additionally, Gastelum was still seated in the driver's seat of his vehicle and not under arrest when he gave consent. Gastelum was only stopped for about 15 minutes when Trooper Pettit asked about luggage. And the stop took place on a busy interstate in broad daylight, not a secluded location. Trooper Pettit, who was the only officer on the scene, did not remove Gastelum from the vehicle until after Gastelum consented, and Trooper Pettit did not handcuff Gastelum until after the drugs were discovered. Finally, Gastelum never "objected to the search," but rather "stood by silently" after

opening the trunk.  Id. (citations omitted).  Nothing about this encounter shows that Gastelum's will was so "overborne and his capacity for self-determination [so] critically impaired" that "his consent to search must have been involuntary." United States v. Johnson, 956 F.3d 510, 516 (8th Cir. 2020) (citations omitted).

Given the friendly atmosphere, rapport, and conversation that had developed between Trooper Pettit and Gastelum coupled with Gastelum's characteristics, demeanor, and responses throughout the encounter, the district court did not clearly err in finding Gastelum voluntarily consented to the search.  Under the totality of these circumstances, which were recorded on video, a reasonable officer would have believed that Gastelum's consent to search the trunk was "the product of an essentially free and unconstrained choice that [he] was making." United States v. Welch, 951 F.3d 901, 906 (8th Cir. 2020) (citations omitted).

The Supreme Court has cautioned against creating *per se* rules in the Fourth Amendment context when the proper inquiry is consideration of the totality of the circumstances and has also held that an officer is not required to advise suspects of their right to refuse consent to a search. United States v. Drayton, 536 U.S. 194, 201, 206–07 (2002).  We, therefore, decline Gastelum's invitation to create a bright-line rule requiring an officer to specifically advise a defendant of his right to refuse a search where an initial comment was made that might be interpreted as a command.

In light of the totality of the circumstances in this case, which included a friendly encounter and three affirmative responses from Gastelum to Trooper Pettit's three follow-up questions seeking permission to search, we need not reach the question of whether there should be a rule requiring or recommending an admonition from a law enforcement officer of the right to refuse a search.

## III.   CONCLUSION

For the foregoing reasons, we affirm the denial of the suppression motion.

KELLY, Circuit Judge, dissenting.

I agree that Trooper Pettit did not unreasonably prolong Gastelum's traffic stop, but in my view he unlawfully searched the trunk of Gastelum's car without his voluntary consent. I would therefore reverse the district court's denial of Gastelum's motion to suppress evidence.

"Under the fourth and fourteenth amendments, searches conducted without a warrant issued upon probable cause are presumptively unreasonable, subject to a few specifically established exceptions." United States v. Escobar, 389 F.3d 781, 784 (8th Cir. 2004) (quoting United States v. Cedano-Medina, 366 F.3d 682, 684 (8th Cir. 2004)). Consent is one of those exceptions. Id. ("[A] warrantless search is valid if conducted pursuant to the knowing and voluntary consent of the person subject to a search."). And it is the government's burden to establish both that the search was consensual and that the consent given was voluntary. See United States v. Magallon, 984 F.3d 1263, 1280 (8th Cir. 2021); see also United States v. Jones, 701 F.3d 1300, 1317 (10th Cir. 2012) ("Voluntary consent consists of two parts: (1) the law enforcement officers must receive either express or implied consent, and (2) that consent must be freely and voluntarily given." (cleaned up)).

First, "[t]o show that a person *consented* to a search, the Government must demonstrate by a preponderance of the evidence that consent was the product of an essentially free and unconstrained choice." United States v. Garcia-Garcia, 957 F.3d 887, 895 (8th Cir. 2020) (emphasis added) (cleaned up). "[M]ere submission to a claim of lawful authority" does not suffice. Id. (cleaned up). And although consent may be inferred from a "subject's words, gestures, and other conduct," it "cannot be

presumed from the absence of proof that a person resisted police authority or proof that the person merely acquiesced." Magallon, 984 F.3d at 1280 (cleaned up). "The ultimate question is not whether [Gastelum] subjectively consented to the search, but rather, whether a reasonable officer would believe consent was given." United States v. Garcia, 888 F.3d 1004, 1009 (8th Cir. 2018) (cleaned up). Accordingly, the central question in this case is whether it was reasonable for Trooper Pettit to believe that Gastelum gave him permission to search the trunk of his rental car. See Magallon, 984 F.3d at 1280.

Based on my review of the record, I do not agree that a reasonable officer would have believed that Gastelum consented to a request—as opposed to submitted to Trooper Pettit's commands—to search his trunk. See United States v. Robertson, 736 F.3d 677, 680–81 (4th Cir. 2013) (concluding that the defendant did not consent to a request—"he merely surrendered to a police officer's command"); cf. Bumper v. North Carolina, 391 U.S. 543, 550 (1968) ("When a law enforcement officer claims authority to search a home under a warrant, he announces in effect that the occupant has no right to resist the search. The situation is instinct with coercion—albeit colorably lawful coercion. Where there is coercion there cannot be consent.").

Consider the facts of the traffic stop. Nearly 15 minutes into the stop, after briefly speaking with Gastelum about his travel plans and checking his license, insurance, and rental information, Trooper Pettit returned to the passenger side of Gastelum's car to issue him a warning. Noting they were "about done here," he asked whether Gastelum had any luggage in the trunk. Gastelum said he had only a duffel bag, and Trooper Pettit replied: "Alright, quick check of that and then we'll be done. Alright, come on out for me and pop that trunk on your way out." Gastelum began to comply, struggling a bit to locate the trunk release in an unfamiliar rental car. Approximately 20 seconds after instructing Gastelum to exit the vehicle and pop the trunk—and critically, while Gastelum continued to comply by searching for the release—Trooper Pettit asked: "You don't mind if I look back there do you? You

don't care, huh? That's fine?" According to Trooper Pettit, Gastelum verbally agreed, popped the trunk, and exited the vehicle.

Whereas the court is content simply to note that Trooper Pettit's initial statement was "problematic," I would recognize this initial statement for what it was—a command—and afford it the significance it warrants. In my view, the instruction to "come on out for me and pop that trunk on your way out" conveyed to Gastelum that he could not refuse to open his trunk. See United States v. Vera, 457 F.3d 831, 835 (8th Cir. 2006) (distinguishing an "authoritative order or command" from a "request—with its implication that the request may be refused" (cleaned up)). In both language and effect, Trooper Pettit's first statement told Gastelum that the traffic stop would not be completed until Gastelum opened the trunk and "c[a]me on out" of the vehicle and Trooper Pettit searched the trunk. That Gastelum responded by immediately searching for the trunk release further indicates that he considered the statement to be an unambiguous command. The district court recognized as much and found that Trooper Pettit's initial statements "appear[ed] to be a command."

The court nevertheless concludes that Trooper Pettit's subsequent statements effectively retracted the prior, impermissible command and clarified that Gastelum was free to refuse. I am not so convinced. It is true that, as a general matter, "[t]here is no *per se* requirement that an officer inform a citizen of his right to refuse consent." Id. But in my view, once an officer has issued a command, it is unreasonable to believe that a person can consent to a follow-up request if the officer has not clearly communicated in some manner that the issued command is no longer in effect. Otherwise, the person will simply continue to acquiesce, compelled to submit to the officer's initial claim of lawful authority. And that is exactly what happened here. Trooper Pettit's leading questions followed closely on the heels of his command, and they did little more than confirm that Gastelum was continuing to do as he was told: "You don't mind if I look back there do you? You don't care, huh? That's fine?" These questions did nothing to reverse course and correct Gastelum's understanding

-13-

that he must comply. And again, Gastelum was actively complying with the prior command to pop the trunk when Trooper Pettit asked these follow-up requests. Without any clear indication from Trooper Pettit that he could do anything but continue to comply, Gastelum continued to submit to Trooper Pettit's claim of lawful authority to search the vehicle *without* consent. See Garcia-Garcia, 957 F.3d at 895; Bumper, 391 U.S. at 550. Under these circumstances no reasonable officer would believe that Gastelum made the "essentially free and unconstrained choice" to consent to a search of his trunk. Garcia-Garcia, 957 F.3d at 895.

As for the court's emphasis on the friendliness of the encounter and Gastelum's age and experience, these considerations inform the question of whether the obtained consent was voluntary, not whether consent existed in the first place. See Magallon, 984 F.3d at 1281 (noting we have generally focused on three categories of factors to determine *voluntariness:* "(1) the nature of the interaction between police and the defendant, (2) the personal characteristics and behavior of the defendant, and (3) the environment surrounding the defendant at the time he gave his consent" (quoting Garcia-Garcia, 957 F.3d at 897)); see also id. at 1280 ("Consent is voluntary if the consenting individual had a reasonable appreciation of the nature and significance of his actions." (cleaned up)). In this case, they reveal nothing about whether a reasonable officer would believe that Gastelum understood Trooper Pettit's initial statement as a command. In any event, even if such considerations were relevant, they cannot overcome the simple fact that Trooper Pettit gained access to the car trunk by ordering Gastelum to open it. For one, Gastelum's age, intelligence, education, and military service all indicate that he would recognize a command from law enforcement when he heard one and obey it. And however cordial Trooper Pettit's tone was, his follow-up questions simply did not clarify (either explicitly or implicitly) that Gastelum could refuse consent to the search of his car trunk *after* he had already been ordered to open it.

This case may seem more challenging than it is because of the apparent bonhomie of the encounter, but the Supreme Court has admonished:

> [T]he Fourth and Fourteenth Amendments require that a consent not be coerced, by explicit or implicit means, by implied threat or covert force. For no matter how subtly the coercion was applied, the resulting 'consent' would be no more than a pretext for the unjustified police intrusion against which the Fourth Amendment is directed.

Schneckloth v. Bustamonte, 412 U.S. 218, 228 (1973). The court imagines that Gastelum, who was already complying with the order to "come on out . . . and pop that trunk," could and should have answered "no" when presented with Trooper Pettit's follow-up questions. If Trooper Pettit had been clear that he was in fact retracting his command, perhaps a person in Gastelum's shoes would have felt comfortable doing as the court suggests. But with a command having been issued just 20 seconds prior, a typical person would not have risked escalating a police encounter by assuming that a follow-up question—such as, "You don't mind?" or "You don't care?"—meant they could suddenly disobey what a law enforcement officer had seconds before directly ordered. Like the court, I do not necessarily recommend a *per se* rule. But in this particular situation, after considering the totality of circumstances, I believe the government failed to establish that Gastelum voluntarily consented to the search of his car trunk as opposed to lawfully complied with the trooper's command to allow the search.

I respectfully dissent.

_____