# United States Court of Appeals
## For the Eighth Circuit

_____

No. 25-2244
_____

United States of America

*Plaintiff - Appellee*

v.

Michelle Lee Marr

*Defendant - Appellant*

_____

Appeal from United States District Court
for the District of Nebraska - Omaha

_____

Submitted: February 10, 2026
Filed: May 28, 2026

_____

Before COLLOTON, Chief Judge, BENTON and KELLY, Circuit Judges.

_____

BENTON, Circuit Judge.

A jury convicted Michelle Lee Marr of second-degree murder and tampering with documents or proceedings in violation of 18 U.S.C. §§ 1111, 1512(c)(1), and 1153. The district court[1] sentenced her to 300 months in prison for the murder and

---

[1]The Honorable Brian C. Buescher, United States District Judge for the District of Nebraska, adopting the reports and recommendations of the Honorable Michael D. Nelson, United States Magistrate Judge for the District of Nebraska.

240 months for the tampering, to be served concurrently. Marr appeals her conviction and sentence. Having jurisdiction under 28 U.S.C. § 1291, this court affirms.

On March 12, 2022, around 12:19 p.m., Marr called 911, reporting that her boyfriend, Jesse Gilpin, was unresponsive. He was rushed to the hospital. Medical staff saw bruises on his face and body covered up by makeup. Marr told them that Gilpin "woke up this morning and put makeup on to cover his bruises." He died the next day.

On March 13, FBI Special Agent Joel Feekes (in plain clothes, without a visible firearm) and Winnebago Tribal Police Officer Matthew Benson (in uniform, armed) interviewed Marr at her mother's home. Marr said that she and Gilpin shared a cell phone. Agent Feekes asked if she was "comfortable" giving them possession of the phone. She gave them the phone and password.

On March 17, Agent Feekes (in plain clothes, without a visible firearm) interviewed Marr at her home. He asked her to sign a consent-to-search form for the phone. She did. The form said Marr had "been advised of [her] right to refuse consent" and gave "this permission voluntarily." Agent Feekes gave her the opportunity to read the form but did not say that she had the right to refuse. He later testified that he did not have the form with him at the March 13 interview, but that no one searched the phone before Marr signed the consent form.

On May 18, Agent Feekes (in plain clothes, without a visible firearm) and FBI Special Agent Paul Voss (in plain clothes, without a visible firearm) interviewed Marr again at her home. Beginning the interview, Agent Feekes told Marr, "You know, this is voluntary. Like, you don't have to talk to us. And obviously you are not in any kind of custody with us." Agent Feekes conceded that the third interview was "an interrogation" but described the tenor as "calm" and "conversational." Marr told the agents that some time before March 12, she applied makeup to Gilpin's face because he asked her to cover a bruise. Agent Feekes questioned her about

-2-

inconsistences between what she had told him and what she had told hospital staff after Gilpin was admitted. The agents suggested she had struck Gilpin and that a jury would find her guilty of murdering him. She accused them of "trying to make [her] say something." They asked her to take a polygraph. She declined.

At trial, the government introduced Marr's statements from the interviews with Agent Feekes and images from the cell phone, including one showing Gilpin about 14 minutes before Marr called 911 lying down with bruising covered by makeup. The district court denied Marr's motion to suppress these statements and the phone evidence. She also moved to exclude 404(b) evidence of her prior assaults of Gilpin—punching him, striking him with a vehicle, and throwing beer cans at him. The court granted it in part and denied it in part. The jury found Marr guilty on both counts.

I.

Marr argues the district court erred in admitting the statements she made to Agent Feekes in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966). This court reviews factual findings for clear error and whether *Miranda* warnings were required de novo. **United States v. Vinton**, 631 F.3d 476, 481 (8th Cir. 2011).

Before an interrogation of a person "in custody," law enforcement officials must administer *Miranda* warnings. *See* **Miranda v. Arizona**, 384 U.S. at 444–45. A person is "'in custody' for purposes of receiving *Miranda* protection," where "there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." **California v. Beheler**, 463 U.S. 1121, 1125 (1983), *quoting* **Oregon v. Mathiason**, 429 U.S. 492, 495 (1977). "The custody inquiry turns on whether, given the totality of the circumstances, a reasonable person would have felt at liberty to terminate the interrogation and leave or cause the agents to leave." **Vinton**, 631 F.3d at 481. Determining the custody issue, this court considers six non-exclusive factors:

(1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions; (4) whether strong arm tactics or deceptive stratagems were employed during questioning; (5) whether the atmosphere of the questioning was police dominated; or, (6) whether the suspect was placed under arrest at the termination of the questioning.

*United States v. Griffin*, 922 F.2d 1343, 1349 (8th Cir. 1990). "No single consideration is dispositive, nor must they all weigh in the defendant's favor" for the court to decide that the defendant was in custody. *United States v. Ollie*, 442 F.3d 1135, 1137–38 (8th Cir. 2006).

Factors 2–6 counsel against a custodial setting for all three of the interviews. Each occurred at her home or her mother's home. "When a person is questioned 'on [her] own turf,'" this setting is "not indicative of the type of inherently coercive setting that normally accompanies a custodial interrogation." *United States v. Czichray*, 378 F.3d 822, 826 (8th Cir. 2004), *quoting United States v. Rorex*, 737 F.2d 753, 756 (8th Cir. 1984). *See United States v. LaRoche*, 83 F.4th 682, 688 (8th Cir. 2023) (finding a defendant's mother's home was a "non-custodial atmosphere"). During the interviews, Marr was not handcuffed nor physically or verbally restrained. *See United States v. Sandell*, 27 F.4th 625, 629 (8th Cir. 2022); *United States v. Laurita*, 821 F.3d 1020, 1025 (8th Cir. 2016). She answered questions voluntarily. Agent Feekes always wore plain clothes with no visible weapons. Marr's mother and adult children were present and involved in parts of the conversations. None of the interviews were "police dominated." *See, e.g.*, *Sandell*, 27 F.4th at 630 (finding no police domination during an in-home interrogation with four officers). The district court found that the interviews were conversational and amicable. *See LaRoche*, 83 F.4th at 688.

-4-

Marr emphasizes that the third interview was confrontational. But whether Marr "was in custody is not a matter of [her] own subject belief." *Ollie*, 442 F.3d at 1137, 1140. For this interview, the first factor also counsels against a custodial setting. Agent Feekes began it by telling her, "You know, this is voluntary. Like, you don't have to talk to us. And obviously you are not in any kind of custody with us." There is no evidence of "strong arm tactics or deceptive stratagems." Any element of confrontation is thus outweighed by the explicit non-custody announcement at the beginning of the interview, the non-police-dominated circumstances, the home settings, and absence of restraint or arrests. *See United States v. Roberts*, 975 F.3d 709, 716 (8th Cir. 2020), *quoting Griffin*, 922 F.2d at 1349 ("The most obvious and effective means of demonstrating that a suspect has not been taken into custody . . . is for the police to inform the suspect that an arrest is not being made and that the suspect may terminate the interview at will.").

By the totality of the circumstances, a reasonable person in Marr's position would have felt free to end the questioning or ask the agents to leave. The district court did not err in ruling that the officers were not required to give *Miranda* warnings because Marr was not in custody.

## II.

Marr argues that the district court erred by finding that she voluntarily surrendered her phone to law enforcement. This court reviews the district court's factual finding on voluntary consent for clear error. *United States v. Steinmetz*, 900 F.3d 595, 598 (8th Cir. 2018); *United States v. Garcia-Garcia*, 957 F.3d 887, 896 (8th Cir. 2020).[2]

---

[2]Citing *United States v. Cook*, 454 F.3d 938 (8th Cir. 2006), Marr believes this court should review for abuse of discretion. Marr confuses the standard of review for evidentiary rulings on admissibility with the standard for reviewing the district court's *factual finding* that the surrender of her phone was voluntary.

The Fourth Amendment guarantees: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." **U.S. Const. amend. IV**. A "warrantless search is valid if conducted pursuant to the knowing and voluntary consent of the person subject to a search." *United States v. Sanders*, 424 F.3d 768, 773 (8th Cir. 2005). *See United States v. Gastelum*, 11 F.4th 898, 904 (8th Cir. 2021). The government has the burden, by a preponderance of the evidence, to show that consent was voluntary. *Id*. The scope and validity of consent is measured by objective reasonableness: "whether it was reasonable for the officer to believe that the suspect gave him permission to search the requested item." *Id*. Determining voluntariness, this court considers:

> (1) the individual's age and mental ability; (2) whether the individual was intoxicated or under the influence of drugs; (3) whether the individual was informed of [his] *Miranda* rights; and (4) whether the individual was aware, through prior experience, of the protections that the legal system provides for suspected criminals. It is also important to consider the environment in which an individual's consent is obtained, including (1) the length of the detention; (2) whether the police used threats, physical intimidation, or punishment to extract consent; (3) whether the police made promises or misrepresentations; (4) whether the individual was in custody or under arrest when consent was given; (5) whether the consent was given in public or in a secluded location; and (6) whether the individual stood by silently or objected to the search.

*Id*. "The voluntariness of consent is assessed under the totality of the circumstances." *United States v. Thomas*, 97 F.4th 1139, 1142 (8th Cir. 2024).

Except for the absence of a *Miranda* warning, all factors counsel in favor of voluntary consent here. Marr, a 50-year-old woman, had been arrested about 20 times. *See Vinton*, 631 F.3d at 482 ("A history of interaction with the criminal justice system supports an inference that an interviewee is familiar with his constitutional rights and that his statements to the police are voluntary."). Requesting the phone, Agent Feekes asked, "Well, would you feel comfortable giving us that phone now?" Marr replied, "mm-hmm, Okay, yeah, take it." Days

later, Marr consented in writing. After taking time to get her glasses and review the form, she signed and acknowledged, "I have been advised of my right to refuse consent." She thus twice consented to the search of her phone, in voluntary, non-custodial discussions in her home and her mother's home. *See Gastelum*, 11 F.4th at 904 ("An important consideration when assessing the voluntariness of consent is the environment" in which it is given.). A reasonable person would understand she knowingly and voluntarily consented to the search.

The district court did not clearly err in finding that Marr knowingly and voluntarily consented to the search of her phone.

III.

Marr contends that the district court erred in admitting under Rule 404(b) the evidence of prior instances where she behaved violently toward Gilpin. This court reviews the admission of evidence for an abuse of discretion. *United States v. Thomas*, 398 F.3d 1058, 1062 (8th Cir. 2005).

"Evidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." **Fed. R. Evid. 404(b)(1)**. "This evidence may be admissible for another purpose, such as proving," as relevant here, intent or absence of mistake. **Fed. R. Evid. 404(b)(2)**. To be admissible under Rule 404(b), evidence must be "(1) relevant to a material issue, (2) similar in kind and not overly remote in time to the crime charged, (3) supported by sufficient evidence to support a jury finding that the defendant committed the prior act, and (4) of probative value not substantially outweighed by its prejudicial effect." *United States v. Proto*, 91 F.4th 929, 932 (8th Cir. 2024). "Subject to the district court's broad discretion to admit evidence of other crimes, we will reverse a district court's decision to admit evidence under Federal Rule of Evidence 404(b) 'only when such evidence clearly had no bearing on the case and was introduced solely to prove the defendant's propensity

to commit criminal acts.'" ***United States v. Littlewind***, 595 F.3d 876, 881 (8th Cir. 2010), *quoting **Thomas***, 398 F.3d at 1062.

The government argues the evidence of Marr's prior violent acts were relevant to prove intent and absence of mistake. Citing 18 U.S.C. § 1111(a), Marr argues that second-degree murder (her charge) does not require proof of intent but rather "malice aforethought." But malice aforethought means "an *intent*, at the time of a killing, willfully to take the life of a human being, or an intent willfully to act in callous and wanton disregard of the consequences to human life." ***United States v. Comly***, 998 F.3d 340, 343 (8th Cir. 2021) (emphasis added). And evidence of "past crimes can be probative of a defendant's intent to commit a similar act." ***Littlewind***, 595 F.3d at 881. Evidence of Marr's prior domestic abuse of Gilpin was relevant to her intent, at the time of the killing, to cause him physical harm.

The evidence was also similar to the second-degree murder charged because it involved acts of physical violence inflicted by Marr against Gilpin. And the prior bad acts were sufficiently close in time (within a year before the murder). *See **United States v. Walker***, 428 F.3d 1165, 1170 (8th Cir. 2005) ("[T]here is no fixed period within which prior acts [under Rule 404(b)] must have occurred," and this court has "approved the admission of other crimes evidence for acts committed up to thirteen years before the crime charged."). The evidence was corroborated by several witnesses, and the district court considered its prejudicial effect. In fact, the court found the evidence of Marr punching Gilpin in the face multiple times to be of "considerable" prejudice. Still, it found the prejudice did not substantially outweigh the evidence's significant probative value. ***Proto***, 91 F.4th at 932 (deferring to a district court's balancing of prejudicial effect and probative value of evidence).

The district court did not abuse its discretion in admitting the evidence of Marr's past violent acts because they were relevant, like-the-charged-offense, recent, supported by several witnesses, and their probative value outweighed any prejudicial effect. *See **Littlewind***, 595 F.3d at 881.

IV.

Marr believes the evidence was insufficient to support the verdict. This court "reviews the sufficiency of the evidence de novo, viewing evidence in the light most favorable to the government, resolving conflicts in the government's favor, and accepting all reasonable inferences that support the verdict." *United States v. Perez*, 61 F.4th 623, 627 (8th Cir. 2023). This court "will overturn a conviction on appeal only if no reasonable jury could have found the defendant guilty beyond a reasonable doubt." *Id*.

On the second-degree murder charge, the government was required to prove beyond a reasonable doubt that: (1) Marr unlawfully killed Gilpin; (2) with malice aforethought; (3) within the exterior boundaries of the Winnebago Indian Reservation in Indian Country; and (4) Marr was an Indian. Marr challenges elements one and two.

On element one, family members testified that the last time they saw Gilpin on the night of March 11, he did not have the injuries that caused his death on March 12. They also testified that Marr and Gilpin were together at home the night of March 11. Marr claimed she passed out at approximately 5:00 p.m. on March 11 and did not wake up until almost noon the next day. But evidence showed she had been actively using her Facebook account on March 12 from 12:43 a.m. to 12:50 a.m. and again at 9:51 a.m. And there was a picture of Gilpin on her phone with a timestamp about 14 minutes before she called 911. In the photo, his injuries were covered by makeup.

Marr repeatedly suggested during trial that Gilpin's death was caused by a ground-level fall. But Dr. Kelly Kruse, the forensic pathologist who performed an autopsy on Gilpin's body, testified otherwise. She found bruising and blunt force injuries to his body and head, specifically around his eyes, lips, cheek, chin, and behind his ear. Dr. Kruse considered whether a fall, or an injury due to alcoholism, could have resulted in his death. She found:

I have seen many people who have died from falls. I've seen many people who have died as a result of alcoholism or sustained injuries from falling in relation to being acutely intoxicated. A few injuries may be appropriate; however, the sheer number of Mr. Gilpin's injuries, in my medical opinion, were inconsistent with a fall or injuries that were sustained from someone who was intoxicated. They're consistent with inflicted injury.

She ruled the death a homicide.

Gilpin's location when found (in his bed) is also inconsistent with a fall. The first doctor who treated him testified that his injuries likely would have rendered him unconscious within seconds, negating his ability to get up and get himself into bed. This evidence was sufficient for the jury to find Marr unlawfully killed Gilpin.

On element two, malice aforethought requires at least "an intent willfully to act in callous and wanton disregard of the consequences to human life." *See Comly*, 998 F.3d at 343. There was evidence of Marr's malice aforethought based on her prior violent acts against him and the severity of his injuries. Many witnesses testified that, several times within two years of the murder, Marr struck Gilpin in the head and generally behaved violently toward him. As the district court found:

> The jury could also reasonably believe that the defendant had an intent willfully to act in callous and wanton disregard of the consequences to human life at the time of the victim's death. The jury heard evidence that the defendant has a long history of physically abusing the defendant by striking him which the jury can consider in determining Defendant's state of mind.
>
> The jury also heard evidence about the extent of the injury that ultimately killed the victim and could have reasonably concluded that the infliction of such an injury required callous and wanton disregard of the consequences to human life.

This evidence was sufficient for the jury to find Marr acted with malice aforethought.

-10-

On the tampering-with-proceedings charge, the government had to prove beyond a reasonable doubt that: (1) Marr altered, destroyed, mutilated, or concealed a record, document or other object; (2) knowingly; (3) corruptly; and (4) with intent to impair the integrity or availability of the object for use in an official proceeding. Three nurses from two different hospitals testified that makeup covered the bruises on Gilpin's eyes and cheeks. Agent Feekes testified that medical staff said he was "caked in fresh makeup, and when they washed off the makeup, they found extensive bruising all over his head and face." Yet multiple people testified they never knew him to wear makeup. And Marr made conflicting statements about whether she or Gilpin applied the makeup and when. At the first hospital she said that Gilpin "woke up this morning and put makeup on to cover his bruises." During an interview soon after Gilpin's death, she told Officer Feekes that "she applied makeup to the left side of Jesse Gilpin's cheek" a day or two before his death. In an interview with Officer Feekes two months later, she said she gave him makeup "because he said he wanted to test it."

The jury found Marr knowingly and corruptly covered Gilpin's injuries with makeup to impair the investigation. And officer testimony showed it was successful. When officers removed Gilpin from the house, they did not notice any bruising, marks, or injuries and thus did not begin an investigation. This evidence was sufficient for the jury to find Marr tampered with proceedings.

Viewed most favorably for the government, the evidence was sufficient to convict Marr of second-degree murder and tampering with proceedings.

V.

Marr argues the 300-month within-guidelines sentence was substantively unreasonable. This court reviews for abuse of discretion. *United States v. Feemster*, 572 F.3d 455, 461 (8th Cir. 2009) (en banc). A sentence within the guidelines is presumed reasonable on appeal. *United States v. Vera-Gutierrez*, 964 F.3d 733, 738 (8th Cir. 2020). "It will be the unusual case when we reverse a district court

sentence-whether within, above, or below the applicable Guidelines range-as substantively unreasonable." ***Feemster***, 572 F.3d at 464.

The district court considered the 18 U.S.C. § 3553(a) factors. It considered the offense conduct "egregious." It noted that Marr lied to law enforcement, "repeatedly seeking to shift the blame for the victim's death" in a way that demonstrates she was "definitely extremely dangerous to those around her." It also discussed how she was "regularly violent towards the victim," and had other arrests including DUIs, assault, child endangerment, and operating a motor vehicle to avoid arrest. The district court did not abuse its discretion.

\* \* \* \* \* \* \*

The judgment is affirmed.

_____